

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-21-2007

# Anspach v. Phila Dept Pub

Precedential or Non-Precedential: Precedential

Docket No. 05-3632

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Anspach v. Phila Dept Pub" (2007). *2007 Decisions.* Paper 327.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/327

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No: 05-3632
_____

MELISSA L. ANSPACH, A MINOR, BY AND THROUGH HER
PARENTS AND NATURAL GUARDIANS,
KURT A. ANSPACH AND KAREN E. ANSPACH; KURT A.
ANSPACH; KAREN E. ANSPACH, IN THEIR OWN RIGHT,

Appellants

v.


CITY OF PHILADELPHIA, DEPARTMENT OF PUBLIC
HEALTH; JOHNF. DOMZALISKI, HEALTH COMMISSIONER;
LOUISE LISI; MARIAFEDOROVA; MARY GILMORE, R.N.;
JITENDRA N. SHAH, M.D.; CITY OF PHILADELPHIA


_____


Appeal from the United States District Court
for The Eastern District of Pennsylvania
D.C. Civil Action No. 05-cv-00810
District Judge: The Honorable J. Curtis Joyner
_____

Argued January 16, 2007

Before: McKEE, AMBRO, and STAPLETON, <u>Circuit Judges</u>

_____

(Filed: September 21, 2007)

_____

JOSEPH P. STANTON, ESQ. (Argued)
Law Offices of Joseph P. Stanton
Jenkintown, PA 19046
<u>Attorney for Appellants</u>

JANE LOVITCH ISTVAN, ESQ. (Argued)
Senior Attorney, Appeals
City of Philadelphia Law Department
Romulo L. Diaz, Jr., City Solicitor
1515 Arch Street, 17th Floor
Philadelphia, PA 19102-1595

ARTHUR B. KEPPEL, ESQ.
CHARLES A. FITZPATRICK, ESQ.
Rawle & Henderson
The Widner Building
1339 Chestnut Street
One South Penn Square, 16th Floor
Philadelphia, PA 19107
<u>Attorney for Appellees</u>

Terry L. Fromson
David S. Cohen
Women's Law Project
125 S. Ninth Street, Suite 300
Philadelphia, PA 19107

2

Susan Frietsche
Women's Law Project
425 Sixth Ave., Suite 1860
Pittsburgh, PA 15222

Paul Messing
Kairys, Rudovsky, Epstein & Messing
924 Cherry Street, Suite 500
Philadelphia, PA 19107
Attorneys for Amici Curiae

---

OPINION

---

McKEE, Circuit Judge.

Melissa Anspach and her parents brought this action against the city of Philadelphia (the "City") and certain of its employees and agents, including the City's Health Department and the Commissioner of Public Health. Melissa is a 16-year-old unemancipated minor. They allege that agents of the City violated Melissa's constitutionally protected right to bodily integrity and parental guidance, as well as her parents' constitutional right to familial privacy and their parental liberty,

3

by providing Melissa with emergency contraception without notifying her parents, or encouraging her to consult with them.[1] Both Melissa and her parents also allege a violation of their First Amendment right of religious freedom, and several causes of action under state law.

The District Court dismissed the federal constitutional claims pursuant to Fed. R. Civ. P. 12(b)(6), and remanded the remaining state claims to state court.[2] This appeal followed.

For the reasons that follow, we will affirm the District Court's dismissal.

## I. FACTUAL AND PROCEDURAL HISTORY

---

[1] Plaintiffs' Complaint mentions their right to familial privacy in the context of Count I, an alleged violation of their fundamental parental liberty interest under the Fourteenth Amendment. Even if we interpret this as a separate allegation from their right to parental liberty, Plaintiffs fail to address this allegation as a separate violation in their Brief. Absent compelling circumstances not present here, failure to raise an argument in one's opening brief waives it. *Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994).

[2] This action was initially brought in state court, but Defendants removed the suit to federal court based upon Plaintiffs' federal constitutional claims.

**A.**

On January 26, 2004, Melissa Anspach visited a health center operated by the City's Department of Public Health (the "Center"). Melissa had recently engaged in sexual intercourse and feared she may be pregnant. Upon arriving at the Center, she requested a pregnancy test, but a receptionist informed her that pregnancy tests were not being administered that day. Melissa then left the Center but returned a short time later after a friend prompted her to "ask for the morning after pill." Upon her return, Melissa was directed to the pediatric ward where she provided her name and date of birth, thereby disclosing that she was sixteen years of age.

Plaintiffs allege that Melissa then spoke with defendant Maria Fedorova, a social worker, for approximately ten minutes. They discussed sexually transmitted diseases, birth control, and emergency contraception. During the conversation, Fedorova confirmed that the Center could provide pills "that would prevent [Melissa] from getting pregnant," and Melissa requested the pills.

5

Defendant Mary Gilmore, a registered nurse, next took Melissa's temperature and blood pressure, and gave her four tablets of "Nordette."[3] Gilmore told Melissa to take four pills right away and then four more in twelve hours.[4] Before Melissa

---

[3] Nordette is part of a group of drugs that are regularly used as oral contraceptives. The Food and Drug Administration has also approved these drugs for use as emergency or contraception following sexual intercourse. *See generally* Dept. of Health and Human Services, Food and Drug Admin., *Prescription Drug Products; Certain Combined Oral Contraceptives for Use as Postcoital Emergency Contraception*, Part V, 62 Fed. Reg. 8610 (February 25, 1997).

The regimen for using Nordette as emergency contraception consists of taking two tablets (0.75 mg in each pill) within seventy-two hours of unprotected intercourse, followed by a second identical dose twelve hours later. *Id*. Emergency contraception provides a short, strong, burst of hormone exposure. Depending on where a woman is in her menstrual cycle and when she had unprotected intercourse, using emergency contraception may prevent ovulation, disrupt fertilization, or inhibit implantation of a fertilized egg in the uterus. *Id*. If a fertilized egg is implanted prior to taking the regimen, the emergency contraception will not work. *See FDA's Decision Regarding Plan B: Questions and Answers* (May 2, 2004), *available at* http://www.fda.gov/cder/drug/infopage/planB/planBQandA.htm.

[4] The number of pills per dosage appears to depend on the amount of hormones contained in each pill. Plaintiffs do not

6

took the pills, Gilmore consulted with Fedorova' "to find out how Melissa should take the pills." She also asked Dr. Jitendra Shah if she wanted to examine Melissa. After determining that the doctor did not want to examine Melissa, Gilmore returned to Melissa, who asked if the pills would make her sick. Gilmore consulted with the doctor once again, and the doctor advised Gilmore to tell Melissa to drink ginger ale. Melissa then took the four Nordette pills in the nurse's presence, and went home.

Melissa took the second dose of pills at home at approximately 4:00 A.M. as she had been instructed. After taking the second dose, she experienced severe stomach pains and began vomiting. Melissa's father came to her room and found her lying on the floor. Upon learning that Melissa had taken emergency contraception, Mr. Anspach called their family physician and the poison control center, and then took Melissa to the emergency room of a nearby hospital. Melissa was treated there and released the same day, but subsequently returned

indicate the amount that each pill contained here.

because of sub-conjunctive hemorrhaging in her eye that was apparently caused by excessive vomiting.

## B.

Plaintiffs thereafter filed a complaint in the Court of Common Pleas in Philadelphia County. They asserted claims under 42 U.S.C. § 1983, as well as various claims arising under state law. The suit was subsequently removed to federal court where the Defendants filed a motion to dismiss pursuant to Rule 12(b)(6).

The parents' § 1983 claims are premised on their contention that Defendants violated their constitutional rights of parental guidance by providing Melissa with medication without parental consent. Melissa alleges that the same conduct violated her constitutional right to bodily integrity and parental guidance under the Fourteenth Amendment. Each of the Plaintiffs claims violations of his or her right to the free exercise of religion under the First Amendment.[5]

The District Court dismissed all of Plaintiffs' claims under

---

[5] Melissa claims she was told that emergency contraception would prevent her from becoming pregnant, but claims she was never informed that the pills could prevent the implantation of a fertilized egg, something that she equates with abortion.

8

§ 1983 and remanded the remaining state law claims to state court. This appeal of the dismissal of the federal constitutional claims followed.

## II. STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of the order granting the motion to dismiss is plenary. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). When reviewing a Rule 12(b)(6) dismissal, we accept as true all well-pled factual allegations in the complaint, *id.,* and view the allegations of the complaint in the light most favorable to the plaintiff. *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002). In a § 1983 action, "the plaintiffs are entitled to relief if their complaint sufficiently alleges deprivation of any right secured by the Constitution." *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000).

Although we view the allegations in the complaint in the light most favorable to the plaintiff, we need not credit "bald assertions" or "legal conclusions." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997). "[L]egal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Morse*, 132 F.3d at

906 n.8 (quoting *Fernandez-Montes v. Allied Pilots Assocs.*, 987 F.2d 278, 284 (5th Cir. 1993)).

### III. DISCUSSION

To state a cause of action under § 1983, Plaintiffs must allege the deprivation of a constitutional right under color of state law. 42 U.S.C. § 1983; *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *see also Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995), *cert. denied*, 516 U.S. 858 (1995). The Anspachs contend in Count I of their Complaint that Defendants' conduct deprived them of their fundamental right to direct Melissa's rearing and education. In Count II, Melissa alleges that Defendants deprived her of her right to parental guidance and advice in matters relating to medical care. Both counts arise out of the liberty interests guaranteed by the Due Process Clause of the Fourteenth Amendment. Plaintiffs also allege that Defendants violated their First Amendment right to free exercise of religion by providing Melissa with medication that could abort a pregnancy in violation of their religious objections to abortion.

### A.    Substantive Due Process

The Supreme Court has long recognized that the right of parents to care for and guide their children is a protected

fundamental liberty interest. *See, e.g., Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Prince v. Massachusetts*, 321 U.S. 158 (1944); *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Parham v. J. R.*, 442 U.S. 584 (1979); *Troxel v. Granville*, 530 U.S. 57 (2000). That constitutional protection is "deeply rooted in this Nation's history and tradition." *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 503 (1977) (citing *Yoder*, 405 U.S. at 503).

Nevertheless, the parental liberty interest is not absolute. It is well-established that "[m]inors, as well as adults, are protected by the Constitution and possess constitutional rights." *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 74 (1976) (overruled in part by *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992)). Accordingly, parental interests must be balanced with the child's right to privacy, which is also protected under the Due Process Clause.

This delicate balance is only implicated, however, if the constitutional rights of both the parent and child are involved. "In a typical § 1983 action, a court must initially determine whether the plaintiff has even alleged the deprivation of a right that either federal law or the Constitution protects." *Gruenke v.*

11

*Seip*, 225 F.3d 290, 298 (3d Cir. 2000) (citing *Baker v. McCollan*, 443 U.S. 137, 140 (1979) ("The first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right secured by the Constitution and laws.") (quotation omitted)). As we shall explain, the allegations here do not establish the constitutional violation required to maintain an action under § 1983. Thus, we need not decide which way that balance would otherwise tip.

### 1. Interference with Parental Rights

Melissa's parents allege a substantive due process violation based on state interference with family relations. They argue that the Center's policies were aimed at preventing parents from learning of their minor daughter's possible pregnancies. In support of their contention, the Anspachs point to the fact that personnel at the Center knew Melissa's age, failed to ask Melissa if her parents knew of her predicament, and failed to encourage Melissa to consult with her parents before deciding whether to take emergency contraception. The Complaint alleges that these facts demonstrate that Defendants "engaged in a course of conduct that was intended to influence Melissa to refrain from discussing with her parents her possible pregnancy and what

12

course of action was appropriate."  App. at 23a.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV.  To state a due process claim under § 1983, the Anspachs must identify a "recognized 'liberty or property' interest within the purview of the Fourteenth Amendment, and [show] that [they were] intentionally or recklessly deprived of that interest, even temporarily, under color of state law." *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990) (citations omitted), *cert. denied*, 498 U.S. 1040 (1991).  However, we must remain mindful that  "section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law."  *Baker v. McCollan*, 443 U.S. 137, 146 (1979); *see also DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 202 (1989) ("[T]he Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation.").

As we noted earlier, the Due Process Clause of the Fourteenth Amendment "protects the fundamental right of

13

parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66. However, "the right is neither absolute nor unqualified." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005). The type of "interference" that the Anspachs assert would impose a *constitutional* obligation on state actors to contact parents of a minor or to encourage minors to contact their parents. Either requirement would undermine the minor's right to privacy and exceed the scope of the familial liberty interest protected under the Constitution.

Courts have recognized the parental liberty interest only where the behavior of the state actor compelled interference in the parent-child relationship. These cases involve coercion that is absent from the allegations in Plaintiffs' Complaint. This point is perhaps best illustrated by *Doe v. Irwin*, 615 F.2d 1162 (6th Cir. 1980), a case very similar to the one before us here.

In *Doe*, a class of parents of minor children sued a publicly funded family planning center. They claimed that the distribution of contraceptives to minors without notice to the parents violated the parents' constitutional rights. The Family Planning Center in *Doe* served both adults and minors. "Neither

14

the Center nor any of its services related to minors [were] advertised, and minors [were] not sought out or encouraged to attend the Center . . . ." *Id*. at 1163. Minors were, however, "permitted to come to the Center either with or without parental consent." *Id.* The Family Planning Center's services included prescription of contraceptives that were distributed to minors "both with and without parental knowledge or consent." *Id.*

The Family Planning Center's programs featured weekly "rap sessions" for minors. They were educational and dealt with methods of birth control, as well as the responsibilities that accompany being sexually active and the "desirability of communicating with parents and others involved with a decision to engage in sexual activities." *Id.* Minors were not served by the Family Planning Center unless they had first attended at least one weekly rap session. These sessions were intended to give "factual information about birth control and human reproduction." *Id*. at 164. Minors who attended a rap session had to register and make an appointment at the Family Planning Center. The first visit to the Family Planning Center included a physical examination. If no medical problems were detected, female minors were usually given a three-month supply of birth

control pills. *Id.* According to the testimony of the administrator of the Family Planning Center, the Center's personnel did not advocate that unmarried teenagers become sexually active, but the personnel tried "to deal with individuals . . ." in a "non-judgmental" way. *Id*. at 1164 (quotation omitted).

The district court in *Doe* found that the distribution of contraceptives to minors without notice to parents violated the parents' constitutional rights. The court entered a permanent injunction and ordered the Family Planning Center to "cease and desist from distributing contraceptives and contraceptive devices to minor, unemancipated children in the absence of notice to the parents . . . and a reasonable opportunity for the parents of such children to consult with their children as to the decision of the child whether or not to obtain contraceptives or contraceptive devices." *Id*. at 1165 (quotation omitted).

The Court of Appeals for the Sixth Circuit reversed. It relied on a line of Supreme Court cases involving the right of privacy, the authority of the state to regulate the conduct of children, and the scope of a minor's right of privacy and concluded that "[a]s with adults, the minor's right of privacy includes the right to obtain contraceptives." *Id*. at 1166 (citing

16

*Carey v. Population Services Int'l*, 421 U.S. 678, 692-93 (1977)).

Citing *Bellotti v. Baird*, 443 U.S. 622 (1979) (*Bellotti II*), the court explained that "[t]he Supreme Court has not squarely decided whether a state may impose a requirement of parental notice, as opposed to parental consent, as a condition of a minor's receiving an abortion." *Doe*, 615 F.2d at 1167. The court observed that the "one fundamental difference" between the case before it and cases where the state had interfered with the rights of parents or the rights of children was that "[i]n each of the Supreme Court cases the state was either requiring or prohibiting some activity." *Id.* at 1168. The court then explained its observation as follows:

> In *Meyer v. Nebraska*, [262 U.S. 390 (1923)] the state forbade the teaching of foreign languages to pupils who had not passed the eighth grade. The Court held the statute not reasonably related to any end within the competency of the state and violative of parents' Fourteenth Amendment right to liberty. In *Pierce v. Society of Sisters*, [268 U.S. 510 (1925)] the statute required all children between the ages of 8 and 16 to attend public schools. The Court found that the law unreasonably interfered with the liberty interest of parents to direct the upbringing and education of their children, including the right to send them to accredited private schools. Again in *Wisconsin v. Yoder*, [406 U.S. 205 (1972)] the law in question made school attendance compulsory. The Court held that Amish parents' First Amendment rights

17

> to the free exercise of their religion were infringed by the attendance requirement. In *Prince v. Massachusetts*, [321 U.S. 158 (1944)] child labor laws were construed to prohibit street sales of religious tracts by children. In that case the Court upheld the conviction of a parent who contended that these laws unreasonably interfered with her right of free exercise of religion and her parental rights. In so holding, the Court determined that a state's authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience.

*Id.* at 1168. Viewed against this legal backdrop, it is clear that Plaintiffs cannot maintain a due process violation when the conduct complained of was devoid of any form of constraint or compulsion.

Plaintiffs compare the absence of protocols in place at the Center here with the rap sessions in *Doe* in an attempt to minimize *Doe's* relevance to our analysis of their claims. *See* Appellants' Br. at 24-25. They emphasize the following aspects of the Family Planning Center's protocol in *Doe*: intra-uterine devices were not dispensed to minors without parental consent, the program encouraged minors to discuss "their sexual interests with their parents," and "[t]he decision on whether a particular individual will receive contraceptives is made in every case by a physician." *Id.* at 25. Although it is clear that the services

18

provided by the Center here are not alleged to include those considerations, we do not think the difference sufficient to alter our analysis or the relevance of *Doe*.

Significantly, no one prevented Melissa from calling her parents before she took the pills she had requested. Plaintiffs attempt to argue that the circumstances surrounding Melissa's visit were tantamount to state coercion and that such coercion was sufficient to establish a due process violation. Plaintiffs cite *Lee v. Weisman*, 505 U.S. 577 (1992), to support their argument that "these were adult employees of the City of Philadelphia telling a 16-year-[old] minor how and what to do. Coercion is plainly inherent in this relationship." Appellants' Br. at 20. We disagree.

In *Lee*, the Supreme Court held that reciting a nondenominational prayer during a high school graduation violated the First Amendment. The Court reasoned that circumstances endemic to a high school graduation coerced those attending to join in the prayer whether or not doing so violated their personal religious beliefs. The Court explained:

> What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context

may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy . . . .

The undeniable fact is that the school district's supervision and control of a high school graduation ceremony places public pressure, as well as peer pressure, on attending students to stand as a group or, at least, maintain respectful silence during the Invocation and Benediction. This pressure, though subtle and indirect, can be as real as any overt compulsion. . . . [F]or the dissenter of high school age, who has a reasonable perception that she is being forced by the State to pray in a manner her conscience will not allow, the injury is . . . real.

505 U.S. at 592-93. The Court also stressed that attendance at the ceremony was not truly voluntary. "[T]o say a teenage student has a real choice not to attend her high school graduation is formalistic in the extreme." *Id*. at 595.

The circumstances here are very different. The Anspachs' allegation of coercion is merely that Nurse Gilmore "told Melissa to swallow the pills before leaving the center." Appellants' Br. at 19. However, Melissa was only given the pills because she asked for them. Arguing that coercion is established because a nurse said "take these," while handing Melissa a glass of water and the pills she had requested, ignores what really happened. Moreover, Plaintiffs' insistence that the atmosphere at the Center

20

was sufficiently coercive to implicate the Due Process Clause is belied by the allegations in their Complaint. The Complaint states that, when she entered the Center for the second time, Melissa requested the morning after pill and was thereafter advised by Fedorova that the Center could provide pills that would prevent Melissa from becoming pregnant. App. at 16-17a. Melissa responded that she would take the pills. *Id.* "Nurse Gilmore then gave four of the pills to Melissa and instructed Melissa to take these pills with water, which Melissa did in Nurse Gilmore's presence." App. at 18a. Simply being told when and how to take a pill that Melissa herself requested is not tantamount to coercion.

In *Arnold v. Bd. of Educ. of Escambia, County, Ala.*, 880 F.2d 305, 308-09 (11th Cir. 1989), the Court of Appeals for the Eleventh Circuit found a constitutional violation where plaintiffs alleged that school officials had engaged in overt acts to procure an abortion for a student without contacting her parents.[6] The school guidance counselor had discovered that "Jane Doe" was

---

[6] *Arnold* was overruled on other grounds by *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993).

21

pregnant. She then summoned Jane to her office for counseling, and, at the expense of the school, procured a pregnancy test that was positive. The counselor and the vice principal of the school then persuaded Jane Doe and John Doe (who had admitted paternity) to obtain an abortion. *Id.* at 309. Because the youngsters could not afford to pay for an abortion themselves, school officials paid them to perform menial tasks so they could raise the money for the procedure. School officials even paid an individual to drive the minors to a medical facility where the abortion was performed. *Id.* at 308-09. The court held that these actions amounted to coercion of a minor to obtain an abortion or to refrain from discussing the matter with her parents in violation of the latter's parental rights. *Id.* at 313.

The defendants in *Arnold* were public school officials in a position of authority over the Doe plaintiffs and the minors there were required by law to attend school where they were subject to the authority of the defendants. The complaint in *Arnold* alleged that the school officials not only pressured the children to refrain from discussing the pregnancy and abortion with their parents, but also imposed their own will on the decision of the children regarding whether to abort the pregnancy

22

in various ways, including by providing them with the money for the procedure and hiring a driver to take them to the appointment. *Id.* at 309. There are no similar acts that could arguably be seen as coercion alleged here.

Nor can the Anspachs find support in our decision in *Gruenke v. Seip*, 225 F.3d 290, 309 (3d Cir. 2000). There, we recognized the parental liberty interest of a mother whose daughter was forced by her high school swim team coach to take a pregnancy test after he became suspicious that she was pregnant. *Id.* at 296-97. Acting on a hunch, the coach discussed his suspicions with other school personnel, including a guidance counselor, and asked other team members about their suspicions. Although spreading this rumor widely, he did not contact the minor's parents. He finally insisted that the swimmer in question take a pregnancy test. *Id.* at 295-96. Thereafter, the student and her mother sued the coach under § 1983 alleging, *inter alia*, violation of the mother's constitutional right to manage her daughter's upbringing as well as the daughter's right to privacy. *Id.* at 297.

In determining whether the plaintiffs had alleged a constitutional violation in *Gruenke*, we recognized both the

parental interest in directing the care of their children and the fact that, "for some portions of the day, children are in the compulsory custody of state-operated school systems. In that setting the state's power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Id.* at 304 (citation and quotations omitted). During this custodial time, in order to maintain order and the proper educational atmosphere, at times, those authorities "may impose standards of conduct that differ from those approved of by some parents." *Id.* Where these standards collide, a court will require the State to demonstrate a compelling interest that outweighs the parental liberty interest in raising and nurturing their child. *Id.* at 305.

We recognized in *Gruenke* that "[s]chool-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children . . . ." *Id.* at 307. However, that recognition does not extend to circumstances where there is no manipulative, coercive, or restraining conduct by the State.

The coach's conduct at issue in *Gruenke* is qualitatively

24

different from Defendants' conduct here. Significantly, he took action in tandem with his authority as the minor's swim coach. Without the minor's invitation, indeed, against her express wishes, the coach had very personal conversations with her in an attempt to have her admit to being pregnant, and he asked other coaches to do the same. *Id.* at 296. When she wouldn't admit to being pregnant, he paid for a pregnancy test and told her, through other members on the team, that unless she took the pregnancy test, he would take her off the relay team. *Id.* In addition, knowing that the minor's possible pregnancy was a topic of gossip among other team members as well as their parents, he would occasionally tell others that it was possible that she was pregnant, while attempting to explain the increase in her times at swim meets. *Id.* at 307.

Here, the Center, a public health clinic, had no authority over Melissa, nor did Center staff become involved in Melissa's reproductive health decisions without invitation. The only factual basis for Plaintiffs' claim is that Nurse Gilmore "instructed" Melissa to take the emergency contraception pills with water and that Defendants neither advised Melissa to talk to her parents before taking the pills nor first offered to let her

25

phone them. *See* Appellants' Br. at 18-19. Unlike the defendant's conduct in *Gruenke*, the Center's actions fail to suggest that Melissa was in any way compelled, constrained or coerced into a course of action she objected to.

The real problem alleged by Plaintiffs is not that the state actors *interfered* with the Anspachs as parents; rather, it is that the state actors did not *assist* the Anspachs as parents or affirmatively *foster* the parent/child relationship. However, the Anspachs are not entitled to that assistance under the Due Process Clause. *See DeShaney*, 489 U.S. at 196. Plaintiffs' arguments to the contrary ignore that the Constitution "does not require the Government to assist the holder of a constitutional right in the exercise of that right." *Haitian Refugee Center, Inc. v. Baker*, 953 F.2d 1498, 1513 (11th Cir. 1992); *see also Ye v. United States*, 484 F.3d 634, 636 (3d Cir. 2007) (no affirmative act constituting deprivation of liberty where publicly employed doctor wrongly assured patient that there was nothing to worry about and that he was fine); *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) ("As a general matter, a State is under no constitutional duty to provide substantive services for those within its border"); *Harris v. McRae*, 448 U.S. 297, 317-318, 100

26

(1980) (no constitutional obligation to fund abortions or other medical services). As the Supreme Court recognized in *Harris*: "Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference . . . , it does not confer an entitlement to such [governmental aid] as may be necessary to realize all the advantages of that freedom." 448 U.S. at 317-318.

The Anspachs attempt to marshal facts to support their argument that the Center "permits no parental involvement at all, and purposefully seeks to separate their children from their parents in the distribution of these pills." Appellants' Br. at 21. However, as we have repeatedly stressed, the Complaint is completely devoid of any allegations that Center personnel told Melissa not to consult her parents before taking the medication, or that Melissa told Center personnel that she was reluctant to take the medication before speaking with her parents and was prevented from doing so, or even that any mention was made of her parents at all. Plaintiffs admit that Melissa entered the Center voluntarily and *requested* the morning after pill. Melissa did not avail herself of the opportunity that she had, prior to taking the medicine or requesting it, to call her parents or to tell the Center

27

staff that she wanted to delay taking the medication to contact her parents. These facts in no way suggest that the state injected itself into the Anspachs' private familial sphere as required for a constitutional violation.

Plaintiffs fail to plead sufficient interference by the state. Here, as in *Doe*, there is no

> requirement [by the State] that the [children] of plaintiffs avail [themselves] of the services offered . . . and no prohibition against the plaintiffs' participating in decisions of their minor [children] on issues of sexual activity and birth control. The plaintiffs remain free to exercise their traditional care, custody and control over their unemancipated children.

*Doe*, 615 F.2d at 1168.

Our analysis in *Parents United for Better Sch. Inc. v. Sch. Dist. of Pa. Bd. of Educ.*, 148 F.3d 260, 276 (3d Cir. 1998) ("*PUBS*"), is not to the contrary. There, we held that a condom distribution program did not violate parental rights because participation in the program was voluntary for both parents and students and the program specifically allowed parents the option of refusing their child's participation. *Id*. at 275-76. Plaintiffs rely on that opt-out provision in their attempt to distinguish *PUBS*. However, a closer look at that decision undermines

28

Plaintiffs' efforts to distinguish it.

As just noted, our conclusion that there was no coercion in *PUBS* was based on two characteristics of the program: its voluntary nature, and the opt-out provision. However, *PUBS* does not hold that an opt-out provision is constitutionally required whenever reproductive health services are provided to minors. We simply recognized that the opt-out provision further undermined the appellants' claim that the condom distribution program was coercive or compulsory. *Id.* at 277. We did not decide whether parental rights would be violated if a state-sponsored condom distribution program did not require parental notification or consent because the issue was not before us.

In *PUBS*, we cited favorably to *Doe,* which found "no deprivation of the liberty interest of parents in the practice *of not notifying them* of their children's voluntary decisions to participate in the activities of the Center." *PUBS*, 148 F.3d at 276 (citing *Doe*, 615 F.2d at 1168) (emphasis added). In quoting this language, we did not limit the relevance of *Doe*; we noted only that the program at issue in *PUBS* was voluntary, just like the program in *Doe*, and that it also provided for parental notification. *Id.*

That *PUBS* does not stand for the proposition that the lack of an opt-out provision is fatal to the constitutionality of a contraceptive distribution program is also evidenced by our reliance on *Curtis v. Sch. Comm. of Falmouth*, 420 Mass. 749, 759 (1995), *cert. denied*, 516 U.S. 1067 (1996). There, the Massachusetts Supreme Court held that because the program at issue lacked "any degree of coercion or compulsion in violation of the plaintiffs' parental liberties, or their familial privacy . . . *neither an opt out provision nor parental notification is required by the Federal Constitution*."

*Id.* at 759-60 (emphasis added). The program in *Curtis* was voluntary, and the court thus rejected the plaintiff parents' request for a programmatic change that would have afforded them notice and the ability to opt out of the program. The court explained:

> We discern no coercive burden on the plaintiffs' parental liberties in this case . . . . Condoms are available to students who request them and, in high school, may be obtained from vending machines. The students are not required to seek out and accept the condoms, read the literature accompanying them, or participate in counseling regarding their use. In other words, the students are free to decline to participate in the program . . . . Although exposure to condom vending machines and to the program itself may offend the

30

> moral and religious sensibilities of plaintiffs, mere exposure to programs offered at school does not amount to unconstitutional interference with parental liberties without the existence of some compulsory aspect of the program.

*Id.* at 757-58. The same is true here. Although the Anspachs' moral and religious sensibilities may have been offended by their daughter seeking out and using emergency contraception, her decision was voluntary. The Constitution does not protect parental sensibilities, nor guarantee that a child will follow their parents' moral directives. Defendants' actions therefore do not "amount to unconstitutional interference with parental liberties . . . ." *Id.* at 758.

We realize, however, that one case that is cited in *PUBS*, but not controlling here, arguably lends some support to Plaintiffs' claim that an opt-out feature may be constitutionally required to protect the parental liberty interest. In *Alfonso v. Fernandez*, 606 N.Y.S.2d 259 (N.Y. App. Div. 1993), the court found a parental liberty violation where condoms were distributed to students upon request in the school's health resource room without an opt-out provision or parental notice requirement. *Id.* at 261. The holding in *Alfonso*, however, is limited to the distribution of contraceptives to minors in a school

31

setting. The court viewed that as coercive because public school attendance is mandatory. *See id.* at 266. This case is distinguishable from *Alfonso* for the same reasons that the *Alfonso* court distinguished *Doe*:

> In *Doe* the plaintiffs were attempting to enjoin the distribution of contraceptive devices to their children at a public clinic. The clinic, however, was not inside a school or other building where the parents were obliged by law to send their children. Consequently, in *Doe* there was no State compulsion on parents to send their children into an environment where they had unrestricted access to free contraceptives, which is precisely what the petitioners in the instant matter must do.

*Id.*

Although the Anspachs make much of their inability to opt out of the Center's distribution of Nordette, as the foregoing case law makes clear, they overlook the fact that services offered at a public health clinic are wholly voluntary. The Center provides reproductive health services only at the request of individuals who come there and ask for them.

We agree with the District Court that "passive failure on the part of a state agency and its employees cannot form the basis of a constitutional claim." *Anspach v. City of Philadelphia*, 2005

WL 1519014 *3 (E.D. Pa. 2005).[7]  To hold otherwise would stretch the parental liberty interest well beyond its previously defined borders.[8]

## 2. Parental Notification

We also hold that there is no constitutional right to parental notification of a minor child's exercise of reproductive privacy rights.  Plaintiffs claim that their position is supported by parental notification requirements under Pennsylvania law in the context of medical treatment, school field trips, and blood donation.  They argue that, just as the state can require parental notification in the context of a blood donation, the Center had an obligation to notify them when Melissa requested emergency contraception.  *See, e.g.*, 28 Pa. Code § 30.30 (requiring that blood donors between the ages of 17 and 18 have a written

---

[7] Although we quote this statement of the District Court, we do not intend to suggest that the pleadings here establish any "failure" insofar as that term suggests Defendants were under some duty to inform Melissa's parents or instruct Melissa to contact them before she could receive emergency contraception.

[8] Melissa independently asserts a right to receive parental guidance under the Fourteenth Amendment.  However, like her parents, Melissa has failed to allege facts that constitute coercion and thus, like her parents, can not sustain a constitutional violation under our precedent.

consent signed by a parent or guardian). In addition, the Anspachs argue that the Pennsylvania Minors' Consent Act, 35 P.S. § 10101, which allows minors to consent to certain types of medical treatment, prohibits minors from consenting to any form of medical treatment unspecified in the Act.

Plaintiffs' first argument ignores the well-accepted principle that duties under state law can not create constitutional rights. *Fagan v. City of Vineland*, 22 F.3d 1296, 1309 n.9 (3d Cir. 1994) (en banc); *see also Paul v. Davis*, 424 U.S. 693, 701 (1975). The notifications Plaintiffs rely upon to fashion a federal constitutional right are all rooted in state law obligations rather than the Constitution. These statutes remain subject to constitutional limitations, including the minor's own privacy rights as well as the state's legitimate interest in the reproductive health of minors. Second, even if the Anspachs could ground their constitutional claim to notification in state parental consent law, they still could not prevail. The Minors' Consent Act specifically permits minors to "give effective consent for medical and health services to determine the presence of or treat pregnancy . . . and the consent of no other person shall be necessary." *See* 35 P.S. § 10103.

34

We are also unpersuaded by Plaintiffs' reliance on Supreme Court cases that permit parental notification in the abortion context. They argue that parental consent is required for the distribution of emergency contraceptives in Pennsylvania unless the court allows the minor to "bypass" the parent when the court has determined that the minor is mature enough to make her own decision, or that the procedure is in the minor's best interest. However, the cases that Plaintiffs cite are fundamentally distinct from this case in both origin and application. They concern the constitutional limitations on a state to interfere with a minor's right to abortion, rather than a parent's affirmative right to be apprised of a minor's reproductive decisions generally.[9]

---

[9] *See, e.g., Lambert v. Wicklund*, 520 U.S. 292 (1997) (finding statute's judicial bypass provision, allowing waiver of notice requirement if notification was not in minor's best interest, sufficient to protect minor's constitutional right to abortion); *Casey*, 505 U.S. 833 (upholding statute's parental consent requirement for minor's abortion based on the existence of a judicial bypass mechanism); *Hodgson v. Minnesota*, 497 U.S. 417, 435 (1990) (finding a state statute's two-parent notification requirement for minors seeking abortions unconstitutional, but permitting the notification when coupled with a judicial bypass provision); *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502 (1990) (upholding a statute requiring a minor to notify one parent before having an abortion, subject to a judicial bypass provision)*; see also H.L. v. Matheson*, 450 U.S. 398 (1981) (holding that a parental notification statute did not
(continued...)

The cases Plaintiffs cite developed in response to constitutional challenges to state laws that limited a minor's rights by conditioning the availability of abortions on parental notification and consent. Courts had to determine whether the governmental interest justified a state's intrusion into a minor's right to an abortion. These cases do not, however, create a constitutional right of parental notification about an abortion, or any other reproductive health decision—they merely find such notification constitutionally *permissible* when paired with a judicial bypass provision to protect the minor's health and safety.

Plaintiffs again rely on *Arnold* and *Gruenke* for their contention that it is Defendants, not the parents, "who must establish an absolute proposition . . . that parents *never* have any right to notice, or to the basic medical background examination of their immature minor daughter prior to the administration of morally controversial and potentially harmful medication." Appellants' Br. at 22 (emphasis in original). However, neither *Arnold* nor *Gruenke* provide for a constitutional right to notice.

---

[9](...continued)
impermissibly burden a minor's right to obtain an abortion).

Plaintiffs acknowledge that *Arnold* specifically "declined to hold that [school] counselors are constitutionally mandated to notify parents when their minor child receives counseling about pregnancy." *Arnold*, 880 F.2d at 314. While the court in *Arnold* recognized in *dicta* that, in the context of school counseling, such communication should be encouraged "as a matter of common sense," the court by no means suggested that it was constitutionally required or that such a right to notice might be recognized under a different set of circumstances. *Id.* Indeed, the court expressly noted that "[t]he decision whether to seek parental guidance, absent law to the contrary, should rest within the discretion of the minor." *Id.*

Similarly in *Gruenke*, we recognized the unique ability of school officials to exert control and authority over minor students, finding a violation of the parental liberty right when those officials exploit their authority to persuade or coerce a minor into disclosure of a reproductive health condition, or insist on a course of action with regard to certain health decisions. 225 F.3d at 307. We did not, however, recognize a parent's constitutional right to notification by school officials with regard to a minor's reproductive health. Rather, we merely opined in

37

*dicta* that it is doubtful that school counselors have a constitutional right "to withhold information of this nature from the parents." *See Gruenke,* 225 F.3d 290 at 307. Indeed, we distinguish the court's suggestion in *Arnold* that, "[a]s a matter of common sense," counselors should encourage communication, 880 F.2d at 314, noting that the coach was not a counselor whose guidance was sought by a student, but instead, a school official, acting contrary to the student's express wishes that he mind his own business. *Id.* at 306-07.

Here, Melissa, on her own initiative, visited a public health clinic, a facility that, unlike a public school, does not require attendance or exercise authority over its visitors. She then made a choice about whether she should contact her parents before taking the pills she had requested. No one familiar with adolescents will be surprised that she instead consulted a peer. That friend advised her to request emergency contraception, which she did. It is equally unsurprising that she did so without pausing to consult or advise her parents. The Constitution does not require governmental involvement in that decision, and Plaintiffs have failed to plead facts that would establish that the Center inserted itself into Melissa's decision by preventing

38

Melissa from consulting her parents. The Constitution is designed to protect individuals from unwarranted governmental interference, not to require intervention under the circumstances here. *See Arnold*, 880 F.2d at 311 ("It is freedom in the decisionmaking process which receives constitutional protection.") (citing *Roe v. Wade*, 410 U.S. 113; *Griswold v. Connecticut*, 381 U.S. 479; *Carey v. Population Servs. Int'l*, 431 U.S. 678, 694 (1977); *Planned Parenthood v. Danforth*, 428 U.S. 52 (1976); *Eisenstadt v. Baird*, 405 U.S. 438 (1972)). Accordingly, Plaintiffs have failed to allege a constitutional violation.

Though they cite no case law to support their position, Melissa's parents argue that Melissa's particular vulnerability as a 16-year-old minor requesting reproductive health services should tip the balance of liberty interests in their favor. However, allegations that minors seeking reproductive health services are particularly vulnerable can not negate the fact that minors are individuals who enjoy constitutional rights of privacy under substantive due process. *See Danforth*, 428 U.S. at 74 ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of

39

majority."). While parental notification has been permitted in limited circumstances in the context of abortion, *see, e.g.*, *Casey*, 505 U.S. 833, it has never been affirmatively required, nor extended to include other reproductive health services such as access to contraception. *See Carey*, 431 U.S. at 694 (holding that any absolute prohibition on the distribution of contraceptives to minors without parental consent was "*a fortiori* foreclosed."). We therefore reject Plaintiffs' claim to an affirmative constitutional right to notification.[10]

## B.     Free Exercise of Religion

Plaintiffs' final allegation is that Defendants' actions

---

[10] We also note, however, that the state's substantial interest in the reproductive health of minors counsels against recognition of a constitutional right to parental notification when a minor child seeks confidential health care services. Federal legislation in this area, in particular Title X of the Public Health Service Act, supports this precept. 42 U.S.C.A. §§ 300; *see also* 42 C.F.R. § 59.5(a)(4) (implementing regulations for Title X provide that family planning services must be provided without regard to age); *Planned Parenthood Fed'n of America, Inc. v. Heckler*, 712 F.2d 650 (D.C. Cir. 1983) (finding regulations issued by the Secretary of Health and Human Services requiring all providers of family planning services which receive funds under Title X of the Public Health Service Act to notify parents or guardians within ten working days of providing prescription contraceptives to unemancipated minors inconsistent with Congressional intent and Title X, found no support in Title X, and were thus invalid).

interfered with Melissa's First Amendment rights under the Free Exercise Clause. The First Amendment prohibits the government from burdening the free exercise of religion. *United States v. Lee*, 455 U.S. 252, 256-257 (1982). However, the First Amendment is only implicated if the governmental burden on religion is "substantial." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989).

In order to establish a substantial burden, Plaintiffs must once again allege state action that is either compulsory or coercive in nature. *See Lee*, 505 U.S. at 621 (a Free Exercise Clause violation is predicated on coercion); *see also Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 447-451 (1988); *Bowen v. Roy*, 476 U.S. 693, 704-705 (1986); *School Dist. of Abington v. Schempp*, 374 U.S. 203, 223 (1963) (stating that "[the] purpose [of the Free Exercise Clause] is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. Hence it is necessary in a free exercise case to show the coercive effect of the enactment as it operates against him in the practice of his religion."); *see also Mozert v. Hawkins County Bd. of Educ.*, 827 F.2d 1058, 1066 (6th Cir. 1987) (stating that "[i]t is clear that governmental

41

compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion, is the evil prohibited by the Free Exercise Clause."). The concept is a simple one. "In essence, the state may not compel an individual to act contrary to his religious beliefs." *Arnold, supra*, 880 F.2d at 314.

As we previously noted, Melissa argues that her allegation that she was "told to take the pills" and misled by the designation of "emergency contraception" in the literature provided by Defendants establishes the required coercion. However, she does not allege that she informed the clinic staff that her religious beliefs would prevent her from taking the pills if doing so could prevent the implantation of a possibly fertilized ovum. Nor does she allege that she ever inquired about the potential effect of the pills on a possibly fertilized ovum. Our discussion of the absence of coercion is equally relevant here. Plaintiffs do not contend that Defendants actually compelled Melissa to take the pills, or that any of them prevented her from consulting her parents or anyone else before she took them. Instead, their Complaint suggests that Fedorova "misled" Melissa as to the consequences of taking emergency contraception by advising Melissa that the

pills would prevent her from getting pregnant. *See* App. at 17a-19a. We are unable to conclude that Melissa was compelled or coerced to act contrary to her religious beliefs.

Moreover, Fedorova's statement was not inaccurate, nor was it misleading under the circumstances here. The United States Food and Drug Administration has approved oral contraceptives such as Nordette for use as emergency contraception following sexual intercourse in the dosage given to Melissa. *See* 62 Fed. Reg. 8610.[11] Depending upon the point a woman is at in her menstrual cycle when having unprotected intercourse, the emergency contraception regimen, as described by the FDA, may prevent ovulation, disrupt fertilization, or inhibit implantation of a fertilized egg in the uterus. *Id.* The FDA characterizes the Nordette regimen that Melissa was given

_____

[11] Courts ruling on Rule 12(b)(6) motions may take judicial notice of public records. *See Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000). The Commissioner of the Food and Drug Administration's announcement regarding the safety and efficacy of oral contraceptives for use as emergency contraception is a document published in the Federal Register. It is therefore a public record of which we may take judicial notice. We consider it, not for the truth of its contents, but rather as evidence of the information provided by the federal government to healthcare providers regarding the purpose and effect of the emergency contraception regimen.

as "one of the most widely employed methods of pregnancy prevention." *Id.* According to the FDA, "[e]mergency contraception pills are not effective if the woman is pregnant; they act by delaying or inhibiting ovulation, and/or altering tubal transport of sperm and/or ova (thereby inhibiting fertilization), and/or altering the endometrium (thereby inhibiting implantation)." *Id.* at 8611. Furthermore,

> [s]tudies of combined oral contraceptives inadvertently taken early in pregnancy have not shown that the drugs have an adverse effect on the fetus, and warnings concerning such effects were removed from labeling several years ago. There is, therefore, no evidence that . . . emergency contraception, will have an adverse effect on an established pregnancy.

*Id.* As the federal agency "responsible for protecting the public health by assuring the safety, efficacy, and security of human . . . drugs . . . and helping the public get the accurate, science-based information they need to use medicines," the Defendants were entitled to rely on the FDA's scientific and policy conclusions. *See FDA Mission Statement*, available at http://www.fda.gov/opacom/morechoices/mission.html. In particular, Defendants were entitled to rely upon the FDA's conclusion that scientific studies demonstrated that emergency

44

contraception does not have an adverse effect on an "established pregnancy." 62 Fed. Reg. 8610.

The governmental actors here must, of course, respect Plaintiffs' religious beliefs about when life begins and what constitutes an abortion; however, the Free Exercise Clause, "cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens . . . ." *Lyng*, 485 U.S. at 448 (quoting *Bowen v. Roy*, 476 U.S. 693, 699-700 (1986)). "[I]ncidental effects of government programs, which . . . have no tendency to coerce individuals into acting contrary to their religious beliefs, [do not] require the government to bring forward a compelling justification for its otherwise lawful actions." *Id.* at 450-451. Melissa failed to disclose her religious beliefs about abortion to any Defendant, and Defendants were entitled to base their actions on Melissa's request for emergency contraception and the FDA's characterization of the emergency contraception Melissa was given.[12]

_____

[12] Judge Stapleton would assume *arguendo* that there may be situations in which a state actor's intentional deception will provide the "coercion" necessary for a violation of the Free

(continued...)

45

In a related and interwoven claim, Melissa's parents also allege a free exercise claim under § 1983, arguing that Defendants prevented them from learning of Melissa's request for something that could terminate a pregnancy. However, we reiterate that the Constitution does not impose an affirmative obligation on Defendants to ensure that children abide by their parents wishes, values, or religious beliefs. *See Doe*, 615 F.2d at 1168 (citing *Prince*, 321 U.S. at 166). Moreover, even if we assumed, *arguendo,* that giving Melissa emergency contraception under these circumstances somehow violated her parents' First

---

[12](...continued)
Exercise Clause. He would hold, however, that this is not such a case. Melissa's only claim to have been deceived is that Ms. Fedorova led her to believe that the pills would only prevent a pregnancy when, in fact, they also would keep a fertilized egg from becoming implanted in the uterus, thereby, in Melissa's view, causing an abortion. While it is apparently true that Nordette "alters . . . the endometrium (thereby inhibiting implantation)," 62 Fed. Reg. at 8611, and it is true that Melissa was not so advised, Melissa did not tell anyone at the clinic of her religious views regarding abortion and there is no reason to believe anyone was deliberately trying to mislead Melissa into violating her religious beliefs. She does not allege intentional or reckless deception. Judge Stapleton would hold that the absence of such an allegation is fatal to her Free Exercise claim. *Lovelace v. Lee*, 472 F.3d 174, 201 (4th Cir. 2006) (holding that "unintended denials of religious rights do not violate the Free Exercise Clause.").

46

Amendment rights, their claim would still fail for the reasons we have already discussed; they have not alleged sufficient facts to establish coercion, manipulation, or restraint.

## IV. CONCLUSION

Because we agree that the allegations in Plaintiffs' complaint have failed to state a cause of action under § 1983, we will affirm the decision of the District Court.