

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-11-00028-CR

_____


CYNTHIA ANN HUDSON, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 5th Judicial District Court
Cass County, Texas
Trial Court No. 2009-F-00005


Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss
Dissenting Opinion by Justice Moseley

OPINION

At the end of a day of brutal beatings by Cynthia Ann Hudson of her adopted, thirteen-year-old son, Samuel,[1] paramedics arrived at the Hudson home and found Samuel's badly bruised body, clad only in clean white briefs, on the floor of his starkly bare bedroom. From her conviction for capital murder,[2] Hudson appeals, urging nine points of error.[3] We reverse and remand for a new trial, because—although (1) the evidence was sufficient to support the jury finding of intent to kill, (2) the evidence was sufficient to support the jury finding of kidnapping, and (3) Hudson's constitutional challenges fail—(4) Hudson was entitled to a jury question on manslaughter.

We address each of the two evidentiary issues and the constitutional challenge before addressing Hudson's manslaughter issue. Because of our disposition, we do not address the other points of error.

*(1)    The Evidence Was Sufficient to Support the Jury Finding of Intent to Kill*

Hudson claims that the evidence was insufficient to prove capital murder, both because there was insufficient evidence of intent to kill and because the evidence was insufficient to prove

---

[1] While the deceased child was named Samuel, we have used pseudonyms for the other minor children referenced herein for their protection.

[2] The trial court automatically sentenced Hudson to life imprisonment without the possibility of parole. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, §1 (West Supp. 2011).

[3] Hudson claims there is insufficient evidence to show intent to kill, it was error to omit a manslaughter instruction, the judgment was improperly amended, a parent cannot kidnap his or her own child, the kidnapping statute is unconstitutional, there is insufficient evidence to prove kidnapping, the indictment is defective in omitting the elements of kidnapping, and the indictment is defective in not fairly informing Hudson of the kidnapping element.

2

kidnapping. *See McFarland v. State*, 930 S.W.2d 99 (Tex. Crim. App. 1996); *Nash v. State*, 115 S.W.3d 136, 139–40 (Tex. App.—Texarkana 2003, pet. denied)  (appellate court must always address challenges to sufficiency of evidence).   Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge.  *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).   The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."  *Id.*

First, we address Hudson's claim that there was insufficient evidence to prove she intentionally caused Samuel's death.  The indictment charged Hudson with capital murder— intentionally causing Samuel's death while in the course of committing or attempting to commit kidnapping.[4]  Capital murder is "a result-of-conduct oriented offense."  *Roberts v. State*, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008).   While murder may be caused by intentionally or knowingly causing the victim's death, capital murder includes the element that the actor intentionally caused the victim's death.  *Morrow v. State*, 753 S.W.2d 372, 375 n.3 (Tex. Crim. App. 1988); *see also Alvarado v. State*, 912 S.W.2d 199, 224–25 (Tex. Crim. App. 1995) (capital murder under Section 19.03(a)(2) requires intentional murder; knowing murder does not suffice).

---

[4]*See generally* TEX. PENAL CODE ANN. § 19.03 (capital murder) (West Supp. 2011), § 20.03 (kidnapping) (West 2011).

3

Late on the fateful day, Hudson's husband, William (Bill), called 9-1-1 to report Samuel's death, which he initially said was the result of choking. The responding paramedic Tim Tolleson and first deputy on the scene both were struck by the sight of the dead boy, clad only in "spotless" briefs, lying in the center of the bare room. The child bore bruising, "stripes," from his neck to his feet. Some wounds were fresh; some were partially healed. By the time Tolleson arrived, rigor mortis had set in, and Samuel's body was cold and stiff. When he asked the parents about the plethora of wounds and marks on the boy's body, they explained he had "reactive attachment disorder," or "RAD" and had a history of self-mutilation. The surviving children were removed that night to the home of the family's pastor. When the children's clothing was delivered to them a day or two later, hidden in the clothing left for Samuel's brother Gary, was a note from Hudson suggesting to him that he had not seen her beat Samuel and telling him to dispose of the note.

A couple of days later, Hudson was found, bleeding, at a roadside park. She had cut her arms inside the elbows and left a note "for the cops" claiming responsibility for beating Gary and Samuel, and for "murder[ing]" Samuel.

Gary, Samuel, and Elaine were all blood-siblings adopted by Hudson and Bill. In the few days between Thanksgiving Day and December 3, 2008, Samuel had been confined to his room and "fasted," that is, deprived of food. Gary's testimony—and his written statement, also admitted into evidence—regarding the events preceding, and on the afternoon of, December 3 constituted central evidence at trial. That evidence painted a brutal picture.

4

Gary testified that, to be released from his room, Samuel needed to "repent" of lustful thoughts.[5]

Starting at or soon after 2:30 p.m., December 3, Hudson beat Samuel periodically, with various implements. The first implement used to beat Samuel appears to have been a broom handle. During those early beatings, Samuel reportedly said, "I repent," but the beatings continued. When the broom handle broke, Hudson asked Gary to bring her a mop with a metal handle, which ultimately bent under the continued beatings of Samuel. Hudson then sent Gary out for a red and black metal garden rake, with which she continued the beatings. The rake handle apparently bent also, prompting Hudson to emerge from Samuel's room expressing the desire for something that would not bend. Hudson's solution was a white, metal baseball bat, with which she beat Samuel more. During the beating with the bat, Hudson reportedly told Samuel to move his head, Samuel said that she was breaking his bones, and she said, "I told you to move your head."

After telling Samuel to sit up, Hudson then left the room. When she returned, Samuel was still lying on the floor. She responded by hitting him with a green computer cord, but he remained on the floor. She warned him that, if he did not get up, she would get the bat. He stayed on the floor. She hit him until she got tired. Hudson directed Gary to come into the room and help

---

[5]Gary testified that, in the two to three weeks before the beatings, Samuel had been confined to his room. Gary said Hudson had imposed "fasting" on Samuel, which meant fasting from food, drink, and sometimes bathroom use. Hudson made the children fast to "give [them] time to repent instead of having worldly desires." Samuel was confined to his room because "Miss Cynthia [Hudson] said she was having deviant thoughts, or lust." There was an alarm system in the house which, when armed, made a noise whenever a room's door was opened.

5

stand Samuel up. She removed zip ties from Samuel's wrists, because his hands were turning blue. Samuel was having trouble standing up, in spite of Hudson's directions that he do so; he said he felt like he was "dying." Hudson dropped Samuel to the floor and left him for twenty minutes, only to return with the bat, sit him upright, and continue the beatings with the bat, hitting him in the chest, arms, and legs, and kicking him in the ribs.

At some point late in the afternoon, Hudson called Bill, who came home around 7:00 p.m.—much earlier than usual. Gary said the two parents spoke in the "prayer room" (also referred to as the "book room") for a time, then Bill went to Samuel's room; Gary heard a slapping sound. Hudson then sent the children to the prayer room and instructed them to pray. A few minutes later, she came in and told the children Samuel had committed suicide. Gary said this made him mad and sad because he knew Samuel had not committed suicide. Gary said that Hudson then told him and Bill to "gather up all the tools that she whipped him with . . . . the ones that, you know, all the ones that I gotted [sic] for her and the ones that she used to beat us with."[6] Gary said he and Bill gathered the implements and weapons before paramedics were called. Bill took them to his shop, a building behind the house. Gary went outside and looked in the window to see Samuel on the floor of his room, with a blanket over him and his eyes halfway opened. The lights were on, and he had nothing wrapped around his neck. Before the police arrived, Hudson "told us what to say, but to be honest." She told Gary to tell police that he and Samuel "had wars

---

[6]The pronoun "us" drew an instruction and limiting instruction; there were indications Hudson also beat Gary, if not the other children.

with switches and stuff to explain the stripes that were on him." After this, the children were removed from the Hudson home. Soon a note came from Hudson, directed to Gary:

> I love you. You saw nothing of Samuel's spankings. You never saw him get whipped. [REDACTED] Nothing -- no part at all. Flush this. Make sure it goes down. I love you, Mom.

Samuel's sister Elaine corroborated much of the abuse described by Gary. On Thanksgiving, a few days before Samuel's death, Elaine saw "brownish-reddish marks, looked like bruises on Samuel's arms." After Thanksgiving dinner, Elaine and Samuel swapped their usual chores—Elaine cleaned dishes in the kitchen, and Samuel cleaned the bathroom because "Hudson didn't want anybody to see Samuel's marks whenever he pulled up his t-shirt." Elaine said that, at some point in the day, Hudson made Samuel change from a short-sleeve to a long-sleeve shirt. Elaine also saw bruises on Samuel's back and neck, and said Hudson, sitting close to Samuel, frequently adjusted his shirt, apparently so the marks would not be visible.[7]

On the afternoon of December 3, Hudson told Elaine that Samuel could not leave his room because Hudson "felt the spirit of lust." That day, Elaine heard Hudson's voice in Samuel's room and heard Samuel screaming, "saying that he doesn't want to live. He was saying let him die" and "that he repents." Samuel sounded as if he was in pain. Elaine said she also heard noises of possible discipline from Samuel's room:

---

[7]Elaine said, when asked if Hudson did anything out of the ordinary during the holiday gathering, Hudson "kept on fixing up [Samuel's ] t-shirt"; "[Samuel] had marks on his t-shirt on his back, and so she lifted up his t-shirt to make sure it doesn't [sic] show."

It was a pace of an item beating on Samuel . . . you could follow the trace of it. You could tell that whenever she lifts it up and then down, (claps hands together) it'd be like that. (Claps hands together) And again.

After Samuel's death, Hudson told Elaine and the other children what to do when the police arrived—to tell them Samuel committed suicide and for the children "not to tell on her for beating him." Hudson told Gary to "hide some of the evidence." Hudson instructed the children:

She was telling us that she'll get us fast, she'll get us back fast, soon as possible, and she was telling us that she didn't kill him, kill Samuel, and she was telling us not to tell -- not -- if we tell on her, she'll whoop us until the cows come home.

Elaine testified she never saw Samuel refuse food or hurt himself.

The medical examiner, Dr. Chester Gwin of the Southwest Institute of Forensic Science, testified the cause of death was blunt force trauma and starvation. He classified the death as homicide. The body had bruises and abrasions on his face, neck, chest, back, arms, hands, legs, and the tops of his feet. Some injuries had "squared-off ends," and some looped; the looped-shaped injuries could have been caused by a cord. Some of the injuries were scabbing, indicating having been present "awhile" and were in the process of healing. Others had been created more recently. Samuel had two fractures in his left ulna, one being "fresh" or "very recent." Gwin, however, did not offer any opinion as to the age of the other break. There was also a significant amount of hemorrhaging, ranging from Samuel's sub-scalp, under his shoulder blades, between his ribs, the back of his neck, and arms.

8

Gwin included starvation in his cause of death based on the ketone level in Samuel's blood. The levels were those seen in someone with diabetes, alcoholism, or starvation; and there was no indication Samuel was afflicted by the first two.[8]  Contrary to the testimony of Elaine and Gary, both Hudson and Bill testified there was ample food always available to the children; food was not withheld as punishment.  Hudson said both Elaine and Samuel hoarded food in their rooms.

Gwin said that, in his opinion, the wounds to Samuel could not have been self-inflicted. He also said that it was impossible for someone to choke themselves to death, especially given that Samuel's broken arm would increase the degree of difficulty to generate the arm strength to occlude his own blood flow to choke himself.

Hudson explained that she and Bill adopted "at risk" children and claimed that Gary beat and killed Samuel.  Hudson said that, when she attempted suicide and left a note confessing to the killing a few days after Samuel's death, she had been attempting to take the blame for Gary and keep the family together.  After being interviewed by law enforcement in the days after the death, she told Bill she believed authorities were "going to try to pin this on [Gary]."  When asked at trial why, subsequently, she accused Gary of the killing, she said Gary was "a group of six . . . . The state's taken the children that I was trying to protect with him."[9]  Hudson testified she believed Gary killed Samuel while she was taking a walk around the property December 3, 2008.  She

---

[8]Gwin said the starvation was a relevant contributing factor to Samuel's death, but that the blunt force trauma would be enough to merit a finding of homicide.

[9]Hudson testified that, on December 7, 2009, Hudson and Bill executed voluntary relinquishments of parental rights as to Gary, Elaine, and three other minor children.

9

testified that, when she returned from her hour-long walk, she did not check on Samuel. In her interview with Ray Copeland, Hudson claimed Samuel was alive and acting out, "mad," using "profanities," around 4:30 p.m. when she came back into the house; and, around 6:00 p.m, she called Bill to come home. After she and Bill spoke for a while at the house, Bill went to Samuel's room and found him dead.

Both parents said that, in the weeks before his death, Samuel had been refusing to eat and kicking his bed to hurt himself. Hudson said Samuel's worsening behavior had included "storming," the Hudsons' term for having tantrums or acting out. For some time, Samuel had been exhibiting aggressive behavior and urinating in his room. Hudson said, "[H]e's angry at the mother figure because of the damage in his life." She testified he had RAD, evidencing seventy-five to eighty percent of the symptoms. Neither parent said what those symptoms were; each acknowledged Samuel had not been taken to a doctor, psychologist, or psychiatrist to have this condition diagnosed or treated. Hudson and Bill did claim that they had gone to Dallas looking for a specialist to treat this condition. When confronted by the prosecutor about a journal entry where Hudson wrote, "May 21, I am fasting the children again until June 1," Hudson claimed to have inadvertently omitted "for," such that the entry meant she was fasting for her children. Hudson denied making the statements about the spirit of lust.

As is often the case in homicides, there is no direct evidence Hudson intended to cause Samuel's death. Evidence showed Hudson beat and starved the boy, as part of a maniacal

10

discipline system. But there was nothing overt to show she had the purpose to kill the child. It is certainly possible to interpret the evidence to show only her intent to punish or injure the child. In the middle of the beatings, she stopped to switch implements, to get one that would "affect him." In her "suicide" note, Hudson admits "murder[ing]" Samuel; but the note also claims that the beatings she administered were because Samuel urinated on the floor of his room. The note contains a timeline of the events of December 3. Late in the detail of events, Hudson wrote that, at 6:00 p.m., she "Got scared Samuel was quite [sic] too long," and she called her husband.

Of course, intent may be inferred from any facts which tend to prove its existence, including the acts, words, conduct of the accused, and the method of committing the crime. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Proof of a culpable mental state is often made by circumstantial evidence, such as acts, words, and conduct.[10] *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Dunn v. State*, 13 S.W.3d 95, 98–99 (Tex. App.—Texarkana 2000, no pet.). Intent and knowledge are fact questions for the jury's determination and are almost always proven through evidence of the circumstances surrounding the crime. *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999). The jury's function is to evaluate the credibility of the witnesses and evaluate the evidence. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We give due deference to a jury's determination. *See Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).

---

[10]The State argues Hudson's intent to kill Samuel may be inferred from her conduct, especially her continued beatings, after Samuel cried out that he felt like he was dying, and her acts to cover her culpability.

Evidence of flight or attempts to cover up guilt,[11] can be used by a jury to draw an inference of guilt. *See Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994). Intent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). In a murder case, evidence of a particularly brutal or ferocious mechanism of death, inflicted on a helpless victim, can be probative on the issue of intent or knowledge. *Id*. The jury may infer the intent to kill from the use of a deadly weapon,[12] unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon. *Ross v. State*, 861 S.W.2d 870, 873 (Tex. Crim. App. 1992); *cf. Flanagan v. State*, 675 S.W.2d 734, 744 (Tex. Crim. App. [Panel Op.] 1984). When a deadly weapon is used in a deadly manner, the inference of intent to kill can be very strong. *See Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986).

Here, the brutality in the use of a succession of weapons and the interaction among the players paint a vivid picture that reasonable jurors could interpret to show that Hudson had an intent to kill Samuel. The evidence is sufficient to prove Hudson intentionally caused Samuel's

---

[11]Hudson told Gary and the other children, the night of Samuel's death, to say Samuel had beat himself; she told Gary to tell police he and Samuel played "wars" in the woods and hit each other with switches, which accounted for marks on the boys; and the note Hudson sent to Gary telling him he "saw nothing of [Samuel]'s spankings" and that he never saw Samuel whipped. The State points to Hudson's denial of complicity before the suicide attempt, but her change of storyline, after the attempt, to assert she inflicted no injury to Samuel and that Gary was responsible for the boy's death.

[12]The State claims that the multitude of implements, used as deadly weapons, suggests intent to kill. As a matter of information, the jury was not asked to make any finding regarding whether any of the implements were deadly weapons.

death.  *See Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Lane v. State*, 151 S.W.3d 188, 191–92 (Tex. Crim. App. 2004).

*(2)      The Evidence Was Sufficient to Support the Jury Finding of Kidnapping*

Hudson also challenges the sufficiency of the evidence to prove she kidnapped Samuel.

The trial court limited the definition of abduct, an element in kidnapping.  First, the trial court did not submit to the jury the alternative of restraining by secreting or holding a person in a place where he or she is not likely to be found.  *See* TEX. PENAL CODE ANN. § 20.01(2)(A) (West 2011).  Thus, the only way the State could prove kidnapping was to prove Hudson restrained Samuel with the intent to prevent his liberation by using or threatening to use deadly force.  TEX. PENAL CODE ANN. § 20.01(2)(B) (West 2011).  In an apparent attempt to honor the causation element in the charge's kidnapping component and to keep the jury from finding kidnapping based simply on the violent beatings—when no express evidence suggested that the beatings were needed to hold Samuel in captivity—the trial court's charge then issued the following qualification:

> You are instructed that in this case, you may find the defendant . . . guilty of kidnapping only if you find beyond a reasonable doubt that the said defendant accomplished the kidnapping, if she did, by binding the hands and legs of Samuel with plastic zip ties, and in no other manner.

Hudson made no challenge to this instruction.

The trial court's instruction comes after the definitions of terms in the charge.  The definitions provide that "kidnapping" means abduct, and abduction happens when an actor

13

restrains another with intent to prevent that person's liberation by using or threatening deadly force. The added instruction directs the jury they can only find Hudson guilty of kidnapping if they find she accomplished that kidnapping (i.e., restraining with intent to prevent liberation by using or threatening deadly force) by binding Samuel's hands and legs with zip ties. In other words, Hudson could be found to have kidnapped Samuel only if her use of zip ties to bind the boy's hands and legs qualified as use of deadly force.

But, because we are to apply the hypothetically correct jury charge, we will not apply the trial court's extra instruction, limiting a finding of kidnapping to use of zip ties. The State was required to prove Hudson restrained Samuel, with intent to prevent his liberation, and that she accomplished it by using or threatening deadly force. There is no question that Hudson restrained Samuel, that she intended to prevent his liberation, at least for a time, and that she used and threatened to use deadly force. The key question here is whether there is sufficient evidence to support a finding that she accomplished a continuation of the restraint of Samuel, at least in part, by using or threatening deadly force.

The evidence does not expressly show a causal connection between the use or threat of deadly force by Hudson and Samuel's continued restraint, but the context does, in our opinion, provide some evidence that a reasonable juror could use to find that causal connection. Samuel's "repentance" early in the beatings can reasonably be understood as expressing a desire to leave his room and to end the beatings. One can also interpret the continued beatings thereafter as

14

Hudson's signal that the restraint was continuing and that Samuel was not free to leave. Also, during the course of the afternoon, Samuel obviously became weaker and less able to act to effect his own liberation, another factor that could be interpreted as a causal link between the beatings and the continued restraint.[13]

We conclude that—though the kidnapping statute seems to be stretched here to cover horrendous facts not normally considered kidnapping—there is sufficient evidence to support the kidnapping element in the charge.

*(3)    Hudson's Constitutional Challenges Fail*

Hudson also claims that the Texas kidnapping statute is unconstitutional under both the Due Process Clause of the United States Constitution and the Due Course of Law Clause of the Texas Constitution, both facially[14] and as applied to a parent-child situation, because it implicates the fundamental right or liberty interest of a parent to make decisions concerning the care, custody, and control of that parent's child. Hudson says that, without a parental exception to the

---

[13]We find no requirement that the use or threat of deadly force must be the sole cause of the restraint, or that there be any evidence of an attempt to escape the restraint or of an overt expression of a desire to do so.

[14]The normal facial attack on the constitutionality of a statute fails unless the claimant establishes that the statute is constitutionally infirm in every circumstance. *United States v. Stevens*, ___ U.S. ___, 130 S.Ct. 1577, 1587 (2010); *United States v. Salerno*, 481 U.S. 739, 745 (1987). In other words, the challenger must show that the statute, on its face, always operates unconstitutionally. *City of Corpus Christi v. Pub. Util. Comm'n*, 51 S.W.3d 231, 240–41 (Tex. 2001). Hudson's claim here attacks only a small subset of the circumstances to which the Texas kidnapping statute can apply. We will, therefore, focus on the as-applied challenge. To sustain an as-applied challenge, the party must show that the statute is unconstitutional when applied to that particular person or set of facts. *Tex. Workers' Compensation Comm'n v. Garcia*, 893 S.W.2d 504, 518 n.16 (Tex. 1995). In such a case, the challenger is required to demonstrate only that the statute operates unconstitutionally when applied to his or her particular circumstances. *Id.*; *In re N.C.M.*, 271 S.W.3d 327, 328–29 (Tex. App.—San Antonio 2009, no pet.).

kidnapping statute, it is constitutionally flawed. We disagree.

Hudson correctly points out that a parent's right to make decisions concerning the care, custody, and control of his or her child is a fundamental right with which the government must not lightly be allowed to interfere. *See Troxel v. Granville*, 530 U.S. 57 (2000); *In re Chambless*, 257 S.W.3d 698, 700 (Tex. 2008). But, while the parental right to care for and guide children is a protected fundamental liberty interest, it has limitations. *Anspach v. City of Philadelphia*, 503 F.3d 256, 261 (3d Cir. 2007).

Hudson's constitutional complaint focuses on the "secreting or holding" prong of the kidnapping statute and its potential interference with a parent's right to care for, have custody of, and control the child. We need not reach that part of her argument, as the "secreting or holding" prong is not implicated in this case; the applicable prong here is the intent to restrain the child by the use or threat of deadly force. And, while a parent undeniably has a fundamental liberty interest in his or her relationship with the child, that fundamental liberty interest cannot extend to the use or threat of deadly force against the very child he or she is charged with nurturing. The State's interest in protecting children is as compelling as the parents' "interest in family integrity." *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006).

We agree with Hudson that the State, when affecting fundamental liberty interests, must be serving a compelling state interest and must narrowly draw the law affecting such interests. *See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). Putting aside the secreting-or-holding

16

prong of the kidnapping statute and considering only the prong dealing with restraint by use or threat of deadly force, the one implicated in this case, we believe that aspect of the statute does in fact serve a compelling state interest of protecting individuals, here a child, from the use or threat of deadly force to prevent his or her liberation. We also believe that the instant statute is sufficiently narrow by including within the ambit of the deadly-force prong only those actors who use or threaten deadly force.[15] Certainly, extreme care must be taken to avoid governmental interference with the various means of disciplining children, physical or otherwise, when that discipline falls within the range of reasonable disagreement. But given the Texas kidnapping statute and the instant prong establishing kidnapping based on the intent to restrain through the use or threat of deadly force, we have not been shown, and we cannot see, any such danger here. A parent's fundamental liberty interest cannot extend to allowing him or her to beat his or her child to death or, short of that, to administer or threaten punishment that fits within the definition of "deadly force." We overrule Hudson's constitutional challenges.

*(4)      Hudson Was Entitled to a Jury Question on Manslaughter*

Hudson claims the trial court harmfully erred in not including an instruction on the lesser-included offense[16] of manslaughter in the charge. We agree.

---

[15]While "deadly force" is statutorily defined only in the context of affirmative defenses, *see* TEX. PENAL CODE ANN. § 9.01(3) (West 2011) ("deadly force" can cause "death or serious bodily injury"), we believe the concept is sufficiently well understood to be a sufficient deterrent to Hudson's feared government intrusion into the parent-child relationship.

[16]An offense is a lesser-included offense if:

To determine if a defendant is entitled to a lesser-included-offense instruction, a two-pronged test applies. First, the lesser-included offense must be included within the proof necessary to establish the offense charged. *Hampton v. State*, 109 S.W.3d 437, 440 (Tex. Crim. App. 2003); *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994). Second, there must be some evidence in the record that would permit a jury rationally to find that, if the defendant is guilty, he or she is guilty only of the lesser-included offense. *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007). A defendant can qualify for a lesser-included-offense instruction if the record contains evidence that, if believed by the jury, negates or refutes an element of the greater offense or is subject to different interpretations by the jury. *Saunders v. State*, 840 S.W.2d 390, 391–92 (Tex. Crim. App. 1992). But, a lesser-included-offense instruction is not warranted by just disbelieving evidence proving an element of the greater offense. *Hampton*, 109 S.W.3d at 440–41.

Here, the charge and conviction was for capital murder. *See* TEX. PENAL CODE ANN. § 19.03. The indictment charged that Hudson

---

(1)     it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;
(2)     it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
(3)     it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or
(4)     it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09 (West 2006).

18

> intentionally cause[d] the death of . . . Samuel Hudson, by beating the said Samuel Hudson with a cord, a mop handle, a broom handle, a rake, a baseball bat, and by withholding food from the said Samuel Hudson, and the defendant was then and there in the course of committing or attempting to commit the offense of kidnapping of Samuel Hudson.

The elements of kidnapping, as submitted in the jury charge, allowed for a finding of kidnapping if the jury found Hudson restrained Samuel with intent to prevent his liberation by using or threatening deadly force. *See* TEX. PENAL CODE ANN. §§ 20.01, 20.03 (West 2011). Thus, the State had to prove Hudson (1) intentionally killed Samuel in the course of (2) restraining him, with intent to deprive him of liberation, while using or threatening deadly force (kidnapping). If the jury did not find the elements of kidnapping, and found that Hudson caused Samuel's death, but did so recklessly, she could have been convicted of manslaughter. Therefore, in the circumstances of this case, manslaughter was a lesser-included offense of capital murder.[17]

To be entitled to a lesser-included-offense charge, the evidence must establish the lesser-included offense as a valid rational alternative to the charged offense. *Cornet v. State*, 359 S.W.3d 217, 229–30 (Tex. Crim. App. 2012). Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge. *Ferrel v. State*, 55 S.W.3d 586, 589 (Tex. Crim. App. 2001). In making this decision, courts do not consider whether the evidence is

---

[17]*See Mathis v. State*, 67 S.W.3d 918, 925 (Tex. Crim. App. 2002); *Moore v. State*, 969 S.W.2d 4, 11 (Tex. Crim. App. 1998) (trial court erred in refusing request for instruction on lesser offense of voluntary manslaughter in capital murder case where jury could have found sudden passion) (citing *Cardenas v. State*, 30 S.W.3d 384, 392–93 (Tex. Crim. App. 2000)).

19

credible, controverted, or in conflict with other evidence. *Hall v. State*, 158 S.W.3d 470, 473 (Tex. Crim. App. 2005).

In applying the second prong, the appellate court must examine the entire record instead of plucking certain evidence from the record and examining it in a vacuum. *Ramos v. State*, 865 S.W.2d 463, 465 (Tex. Crim. App. 1993). If evidence from any source raises the issue of a lesser-included offense, a charge on that lesser offense must be included in the jury charge, whether the evidence is introduced by the State or the defense and whether it is strong, weak, impeached, or contradicted. *Bell v. State*, 693 S.W.2d 434, 442 (Tex. Crim. App. 1985). Evidence raising the issue must be considered within the context of the evidence as a whole. *See Ramos*, 865 S.W.2d at 465. Evidence that shows no offense occurred at all fails to raise the issue of a lesser-included offense. *Lofton v. State*, 45 S.W.3d 649, 652 (Tex. Crim. App. 2001).

The State argues Hudson was not entitled to a lesser charge of manslaughter because she did not admit to causing the boy's death. The State cites *Lofton*, for the proposition that a defendant's testimony that he or she did not commit any offense, or testimony showing no offense occurred at all, is not adequate to raise the issue of a lesser-included offense. Lofton was charged with assault on public servant, and wanted the jury charged on the lesser-included offense of resisting arrest. Lofton testified he committed no offense—that he neither assaulted the officer nor resisted arrest. The Texas Court of Criminal Appeals held, "We conclude that the evidence in the instant case did not raise the issue of the lesser-included offense of resisting arrest. A

20

defendant's own testimony that he committed no offense, or testimony which otherwise shows that no offense occurred at all, is not adequate to raise the issue of a lesser-included offense." *Id.* The evidence in that case showed Lofton intended to assault an officer whom Lofton knew was in the process of lawfully discharging his duties. Even if he intended only to prevent his arrest, his use of force at the least recklessly caused bodily injury. *Id.*

In denying Hudson's request for a jury charge on manslaughter, the trial court applied similar reasoning to the State's appellate argument. Citing Hudson's "position that she had absolutely nothing to do with [the killing of Samuel]," the trial court said, "[T]here would have to be some testimony that, Yes, I did inflict the blows, but it was not my intent that it would lead to such a degree of harm and that to engage in that behavior . . . did constitute the conscious disregard of a substantial and unjustifiable risk" in order for some evidence of recklessness to be present.

The instant situation is different from that presented in *Lofton*. Evidence from any source can raise the possibility of an instruction on a lesser-included offense. *See Bell*, 693 S.W.3d at 442. Further, while the Texas Court of Criminal Appeals has said that, where a defendant presents evidence he or she committed no offense or presents no evidence, a lesser-included charge is precluded only where "there is no evidence otherwise showing [s]he is guilty only of a lesser included offense." *Bignall*, 887 S.W.2d at 24. Here, Hudson, like Lofton, testified she committed no offense. But there was other evidence pointing to the possibility of recklessly causing death—the excessive beatings, the restraints on the child, denied nutrition, Hudson's

21

comments that she was punishing Samuel, the various instruments, and the extended length of the beating sessions.[18]   Based on the evidence, there was evidence "directly germane"[19] to the lesser offense of manslaughter; a rational jury could have found Hudson guilty of only that charge.   The jury here had considerable affirmative evidence based on which it could have concluded Hudson recklessly caused Samuel's death; it went far beyond merely disbelieving the evidence tending to show Hudson's intent to kill.   *See Hampton*, 109 S.W.3d at 440–41.

There is evidence in this record that, if believed, negates or refutes the intent-to-kill element and is considerably more substantive than merely disbelieving certain evidence from the State or merely accepting a thoroughly refuted denial by the defendant.   Almost all of Hudson's utterances tended to support the idea that she intended to discipline, not kill, Samuel.   Her brutal acts were done entirely within the context of a parent/child relationship, albeit an abnormal one. At the time Hudson's acts were committed—i.e., before Samuel's death—it is not certain that they could rationally be understood only as ending in Samuel's death.   While the beatings were undeniably vicious, the jury could have concluded that they were intended merely to severely discipline, but not to kill.

This is contrasted with other cases in which various courts found the defendant had not qualified for a lesser-included-offense instruction.   *See Cardenas*, 30 S.W.3d at 392–93 (severe

---

[18]One could conclude that, if Hudson had wanted to kill Samuel, she could have done it much more quickly, given the implements at her disposal.

[19]*Bignall*, 887 S.W.2d at 24.

22

beating, plus strangulation with towel; defendant's claim not to realize how hard he hit victim, insufficient to raise lesser-included offense); *Delgado v. State*, No. 13-08-00490-CR, 2011 WL 1326644, at **8–10 (Tex. App.—Corpus Christi April 7, 2011, no pet.) (mem. op., not designated for publication) (strangling pregnant woman, causing death of her and unborn child; defendant's denial of intent to kill, standing alone, does not require lesser-included-offense instruction); *Yanez v. State*, 187 S.W.3d 724, 743 (Tex. App.—Corpus Christi 2006, no pet.) (with three gunshot victims, defense theory victim was "inadvertently shot" has no support in record and does not raise lesser-included offense).

The trial court erred in declining to instruct the jury on the lesser-included offense of manslaughter. *See Saunders*, 840 S.W.2d at 391–92.

Having found error in the trial court's jury charge, we evaluate the record to determine whether Hudson was harmed. *Hamel v. State*, 916 S.W.2d 491, 494 (Tex. Crim. App. 1996) (citing *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984)). When the defendant raises a proper objection at trial, reversal is required if the error is reasonably expected to harm the defendant. *Almanza*, 686 S.W.2d at 171; *Aguilar v. State*, 914 S.W.2d 649, 651 (Tex. App.—Texarkana 1996, no pet.). The presence of any harm, regardless of degree, is sufficient to require reversal. *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994). With no burden of proof, our determination is made simply from a review of the record. *See Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008); *Ngo v. State*, 175 S.W.3d 738, 750 n.48 (Tex. Crim.

23

App. 2005). The "defendant must have suffered 'some' actual, rather than theoretical, harm from the error." *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986).

The record demonstrates some harm to Hudson. Capital murder requires proof the defendant intentionally caused the victim's death. TEX. PENAL CODE ANN. § 19.03(a)(2). While there is evidence to prove Hudson intentionally caused Samuel's death, such evidence is not conclusive and is open to interpretation. Although Hudson testified she did not kill Samuel, two children in the house testified she beat the boy thoroughly and violently. In the note she left "for the cops" at her suicide attempt, Hudson indicated she beat Samuel as punishment for urinating on the floor. Gary, Samuel's brother who witnessed the beatings, said that Samuel was confined to his room as punishment. Gary and Elaine both testified that Hudson admitted feeling the "spirit of lust." The children's testimony suggests Samuel was responsible for Hudson's lust and was perhaps part of the reason for his confinement or punishment. In between beating sessions, as she switched from a computer cord to a baseball bat, Hudson said she "need[ed] something to affect" Samuel—a statement that, if made, suggests an intent to keep the boy alive more than to kill him. Similarly, Hudson told Samuel, "That's why . . . I told you to move your head" in answers to his screams. This statement undermines a finding of intentionally killing Samuel and tends to support a reckless state of mind.

24

Additionally, the very nature of Hudson's protracted beatings,[20] in addition to evidence she had forced Samuel to fast to the point of starvation, suggest a policy of discipline which amounts to a conscious disregard for the substantial and unjustifiable risk of death, that is, recklessly causing Samuel's death. The jury was not given the chance to make that finding.

If the jury had been given the alternative to convict Hudson of manslaughter, that is, to find that she acted with a reckless state of mind, it is reasonably possible that that might have been the result. Thus, there was harm.

Because Hudson suffered some harm from the denial of a manslaughter charge, we reverse the trial court's conviction and remand the case for a new trial. Having granted relief on Hudson's point of error regarding the lesser-included offense of manslaughter, it is unnecessary to address her other points of error.

We reverse Hudson's conviction and remand to the trial court for a new trial.

Josh R. Morriss, III
Chief Justice

DISSENTING OPINION

There is amply sufficient proof that the victim was subjected to hideously horrendous violent physical abuse that led to his death and that Cynthia Ann Hudson was the person who

---

[20]The medical examiner said that some of Samuel's wounds bore scabs and were in different stages of healing.

perpetrated that treatment. Because of the degree and length of the various means of physical abuse administered to the child by his mother, Hudson, the jury could certainly rationally infer the requisite *mens rea* to convict Hudson of murder. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App.1995).

The problem in this case lies with the proof necessary to meet all of the elements of capital murder. Here, the State alleged (and the jury found) that the murder of the child occurred in the course of "committing or attempting to commit kidnapping." TEX. PENAL CODE ANN. § 19.03(a)(2) (West 2011).

The Due Process Clause of the United States Constitution protects a person from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 316 (1979)). Therefore, in order to prove capital murder as charged here, it was necessary for the State to prove all of the elements of kidnapping, a crime encapsulated in the capital murder charge. As the majority correctly notes, under the charges leveled against Hudson, the only way the State could prove kidnapping was to prove that Hudson restrained her victim with the intent to prevent his liberation by using or threatening to use deadly force. TEX. PENAL CODE ANN. § 20.01(2)(B) (West 2011).

It would appear that in order to prove the requisite *mens rea*, the State had the obligation to show that at least some of the threatened or applied deadly force existed as the result of Hudson's

intention of preventing her victim's liberation. *Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009); *Brimage v. State*, 918 S.W.2d 466, 475–76 (Tex. Crim. App. 1994). All of the evidence in this case pointed to the fact that the deadly force was threatened and (brutally) applied with a different objective than prevention of the victim's liberation in mind: to somehow purge the boy from feelings of lust or to convince him to remove that lust from himself. As stated before, there is overwhelming evidence that force was used against the child, resulting in death. There is, however, simply no evidence from which the jury could rationally infer that the sickeningly, deadly, and lengthy force employed by Hudson was done with the intention of preventing the child's liberation. There was plainly another motive—the intention to exorcise the feelings of lust which Hudson apparently believed to have been residing in the child. It is too great a step for the jury to have reasonably inferred from the evidence that the deadly force visited on the child by Hudson was prompted by her intention to prevent his liberation.[21] As such, the causal relationship between the deadly force applied and the intention to prevent the child's liberation are lacking.

The sole element upon which the State relies to elevate Hudson's crime from murder to capital murder is the kidnapping element. Although it would appear that there was ample evidence to prove murder, the evidence is legally insufficient to prove that Hudson committed the

---

[21]The trial court gave the jury a most unusual instruction: "You are instructed that in this case, you may find the defendant . . . guilty of kidnapping only if you find beyond a reasonable doubt that the said defendant accomplished the kidnapping, if she did, by binding the hands and legs of [the victim] with plastic zip ties, and in no other manner." It would appear from this that the trial court likewise did not tie the deadly force to an intention to prevent liberation.

murder during a kidnapping, the requisite element here of capital murder.

Bailey C. Moseley
Justice

Date Submitted:      February 15, 2012
Date Decided:       May 11, 2012