**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.  A-0037-23
                    A-0046-23
                    A-0118-23

MATTHEW J. PLATKIN, Attorney
General of New Jersey and
SUNDEEP IYER, Director,
New Jersey Division on Civil Rights,

      Plaintiffs-Respondents,

v.

MIDDLETOWN TOWNSHIP
BOARD OF EDUCATION and
MIDDLETOWN PUBLIC SCHOOL
DISTRICT,

      Defendants-Appellants.

_____

MATTHEW J. PLATKIN, Attorney
General of New Jersey and
SUNDEEP IYER, Director,
New Jersey Division on Civil Rights,

      Plaintiffs-Respondents,

v.

MANALAPAN-ENGLISHTOWN

REGIONAL BOARD OF EDUCATION
and MANALAPAN-ENGLISHTOWN
REGIONAL SCHOOL DISTRICT,

      Defendants-Appellants.

_____

MATTHEW J. PLATKIN, Attorney
General of New Jersey and
SUNDEEP IYER, Director,
New Jersey Division on Civil Rights,

      Plaintiffs-Respondents,

v.

MARLBORO TOWNSHIP BOARD
OF EDUCATION and MARLBORO
TOWNSHIP PUBLIC SCHOOL
DISTRICT,

      Defendants-Appellants.

_____

> Argued November 19, 2024 – Decided February 10, 2025
>
> Before Judges Gilson, Bishop-Thompson, and Augostini.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket Nos. C-000080-23, C-000079-23, and C-000078-23.
>
> Bruce W. Padula argued the cause for appellants Middletown Township Board of Education and Middletown Township Public School District, and Manalapan Englishtown Regional Board of Education and Manalapan Englishtown Regional School District

(Cleary Giacobbe Alfieri Jacobs, LLC, attorneys; Bruce W. Padula, on the briefs).

Michael J. Gross argued the cause for appellants Marlboro Township Board of Education and Marlboro Township Public School District (Kenney, Gross, Kovats & Parton, attorneys; Marc H. Zitomer, on the briefs).

Mayur P. Saxena, Assistant Attorney General, argued the cause for respondents (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, Mayur P. Saxena and Sara M. Gregory, Assistant Attorneys General, of counsel and on the briefs; Liza Fleming, Nancy M. Trasande, Jonathan Mangel, Sarah Nealon, Douglas R. Praschak, and Daniel Resler, Deputy Attorneys General, on the briefs).

Joshua W. Dixon argued the cause for amicus curiae The Center for American Liberty (Dhillon Law Group Inc., attorneys; Josiah Contarino, of counsel and on the brief).

Natalie J. Kraner argued the cause for amici curiae American Civil Liberties Union of New Jersey and Garden State Equality (Lowenstein Sandler LLP and American Civil Liberties Union of New Jersey Foundation, attorneys; Catherine Weiss, Natalie J. Kraner, Julie Minicozzi, Anish Patel, Katherine Primatic, Nina Rodriguez, and Jeanne LoCicero, on the brief).

PER CURIAM

In these three appeals, which we address in this consolidated opinion, the Middletown Township Board of Education (Middletown), the Manalapan

Englishtown Regional Board of Education (Manalapan), the Marlboro Township Board of Education (Marlboro), and their related school districts (collectively, the Boards) appeal from orders preliminarily enjoining them from changing their existing policies regarding students' gender identification. The narrow issue before us is whether the trial court abused its discretion by granting the preliminary injunctions while the merits of the disputes are being addressed in administrative proceedings before the New Jersey Division on Civil Rights (the CR Division).

Discerning no abuse of discretion, we affirm the provision of the orders that enjoins the Boards from enacting the amended policies they adopted on June 20, 2023. We reverse, however, the provision of the orders that enjoins the Boards from considering alternative new policies. Moreover, given the length of time that has passed, we point out that if the proceedings before the CR Division do not make reasonable progress soon, the Boards have the right to move before the trial court to lift the preliminary injunctions.

I.

Appellants are three Boards of Education in Monmouth County. Before 2020, each of the Boards had adopted and implemented policies titled "5756-

4

Transgender Students" (collectively, the Existing Policies; individually, the Existing Policy).

Manalapan adopted its Existing Policy in November 2014. Marlboro adopted its Existing Policy in January 2015. Middletown adopted its Existing Policy in May 2019. The Existing Policies generally follow the guidance issued in 2018 by the New Jersey Department of Education (DOE), titled "Transgender Student Guidance for School Districts" (the State Guidance). The DOE had issued the State Guidance in accordance with the Legislature's directive to "assist schools in establishing policies and procedures that ensure a supportive and nondiscriminatory environment for transgender students." N.J.S.A. 18A:36-41(a).

Of relevance to the issues on this appeal, the Existing Policies all state:

> The school district shall accept a student's asserted gender identity; parental consent is not required. . . . There is no affirmative duty for any school district staff member to notify a student's parent of the student's gender identity or expression.

The Existing Policies also recognize that there might be times when the "school district may be obligated to disclose a student's status" because it has "a specific and compelling need" to do so, "such as the health and safety of a student or an incident of bias-related crime."

A-0037-23

On June 20, 2023, each Board adopted an amended policy concerning transgender students (collectively, the Amended Policies; individually, the Amended Policy). The Amended Policies included an affirmative duty for school district staff members to notify a student's parent if a student requested a gender identity change at school. The language of the Amended Policies varied slightly.

The Middletown Amended Policy stated, in relevant part:

> The school district shall accept a student's asserted gender identity; parental consent is not required. . . . The Board finds that conversations with counselors, teachers or other staff about one's gender identity and expression are entitled to confidentiality. However, in the event a student requests a public social transition accommodation, such as public name/identity/pronoun change, bathroom/locker room accommodation, or club/sports accommodations, or the like, the school district shall notify a student's parents or guardian of the student's asserted gender identity and/or name change, or other requested accommodation, provided there is no documented evidence that doing so would subject the student to physical or emotional harm or abuse. It shall be the policy of the Board to support and facilitate healthy communication between a transgender student and their family, rather than foster an unreasonable expectation that a public in-school transition will remain confidential or require district staff to affirmatively misrepresent information to parents.

Following the enactment of their Amended Policy, Middletown drafted regulations which purported to limit the definition of a "public social transition

accommodation."  Those draft regulations, however, were not adopted before the injunction took effect.  Accordingly, Middletown has acknowledged that these regulations were never formally enacted and, therefore, do not modify its Amended Policy.

The Manalapan Amended Policy stated, in relevant part:

> For grades [six] through [eight], the school district shall accept a student's asserted gender identity; parental consent is not required.  For students in grades Pre-K through [five], the responsibility for determining a student's gender identity rests with the student's parents/guardians.
>
> . . . .
>
> The Board finds that conversations with counselors, teachers or other staff about one's gender identity and expression are entitled to confidentiality.  However, in the event a student requests a public social transition accommodation, such as public name/identity/pronoun change, bathroom/locker room accommodation, or club/sports accommodations, or the like, the school district shall notify a student's parents or guardian of the student's asserted gender identity and/or name change, or other requested accommodation, provided there is no credible evidence that doing so would subject the student to physical or emotional harm or abuse.  Prior to disclosure, the student shall be given the opportunity to personally disclose that information.  It shall be the policy of the Board to support and facilitate healthy communication between a transgender student and their family, when disclosure is consistent with this policy.

The Marlboro Amended Policy stated, in relevant part:

7

A-0037-23

Because Marlboro Public School District is a PreK-[eight] District with no high school, the Board believes that greater parental involvement is required because of the age and maturity level of its student-body. . . . [I]n the spirit of transparency and parental involvement, the district will . . . notify a student's parent/guardian of the student's change in gender identity or expression except where there is reason to believe that doing so would pose a danger to the health or safety of the pupil.  A school counselor . . . will notify and collaborate . . . with the student first before discussing a student's gender nonconformity or transgender status with the student's parent/guardian.  That discussion will address any concerns the student has about such parental notification and discuss the process by which such notification shall occur including, but not limited to whether the student wishes to be given the opportunity to notify the parent/guardian first.

. . . .

The Principal or designee should have a discussion with the student and parent/guardian to ascertain the student's preference on matters such as chosen name and chosen pronoun.  However, there may be instances where a parent/guardian of a minor student disagrees with the student regarding the name and/or pronoun to be used at school and in the student's education records.

In the event a parent/guardian objects to the minor student's name and/or pronoun change request, the Superintendent or designee should consult the Board Attorney regarding the minor student's and family's civil rights and protections under the [New Jersey Law Against Discrimination], N.J.S.A. 10:5-1 [to -50].

The Amended Policies for Middletown and Manalapan also stated that if any emotional support services are provided to "transgender students, students facing other gender identity issues, or students who may be transitioning," then "[t]he full, complete, and accurate reason for counseling and/or referrals for mental health crisis and/or concerns shall be provided to the parent/guardians in relation to parental notification/consent for such services."

On June 21, 2023, the New Jersey Attorney General and the Director of the New Jersey Division on Civil Rights (collectively, the Attorney General) filed three administrative complaints with the CR Division alleging that the Boards' Amended Policies violated the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50. Specifically, the Attorney General asserted that the Amended Policies unlawfully discriminated against students based on their gender identity and gender expression. In that regard, the Attorney General alleged that the Amended Policies irreparably harmed transgender students by requiring parental disclosure of their gender identity without their consent.

The same day, the Attorney General filed the three actions giving rise to these appeals in the Chancery Division. In those actions, the Attorney General sought preliminary restraints to enjoin the implementation of the Amended Policies pending a resolution of the administrative proceedings before the CR

9

Division.  In moving for injunctive relief, the Attorney General relied on section 14.1 of LAD, which provides:

> At any time after the filing of any complaint, or whenever it shall appear to the Attorney General or the director that a person has engaged in, is engaging in, or is about to engage in any practice declared to be unlawful by this act, the Attorney General or the director may proceed against any person in a summary manner in the Superior Court of New Jersey to obtain an injunction prohibiting such person from continuing such practices or engaging therein . . . .
>
> [N.J.S.A. 10:5-14.1.]

The trial court heard oral argument on the application for injunctive relief on August 15, 2023.  Three days later, on August 18, 2023, the court issued three orders, supported by an accompanying written opinion, granting the State's request for preliminary injunctions.  The orders enjoined the Boards from (1) "enforcing, implementing, or otherwise giving effect to [the Amended Policies], until such time as the litigation before the [CR Division] . . . is resolved;" and (2) "amending, modifying, or superseding any portion of [the Existing Policies] . . . to preserve the status quo ante prior to the adoption of [the Amended Policies], until such time as the litigation before the [CR Division] . . . is resolved."

In its written opinion, the trial court analyzed the factors that must be established to obtain preliminary injunctive relief. See Garden State Equal. v. Dow, 216 N.J. 314, 320-21 (2013); Crowe v. De Gioia, 90 N.J. 126, 132-34 (1982). The trial court first found that the Attorney General had a "well-settled right, if not obligation, to proceed in a summary manner to enforce a remedial statute protecting members of a statutorily protected class in New Jersey from discrimination." Second, the trial court found that "[w]here, as here, only students who identify as transgender are singled out for mandatory parental notification, the [Attorney General] has demonstrated a reasonable probability of success on the merits of its claim that the Amended Policies effect differential treatment of members of a protected class in violation of the LAD." The trial court also found that the Attorney General had "demonstrated a reasonable probability of success on its claim that the Amended Policies of parental notification '[would] unlawfully subject these students to a disparate impact in violation of the LAD.'"

Third, the trial court concluded that "[t]he evidence supporting the [Attorney General's] position that parental notification has a disparate impact on transgender, gender non-conforming, and non-binary students equates to a harm imposed on these students that cannot adequately be redressed by money

11

damages." The trial court then pointed to evidence submitted by the Attorney General, including studies which documented the disparate impact through elevated incidences of "mental health issues, suicide, illicit drug dependency, and infliction of physical or emotional harm by immediate family members."

Finally, the trial court found that "no [Board] has made any compelling argument that adherence to the [Existing] [P]olicies governing transgender students while the administrative action is pending will result in any claim, liability, or hardship." In support of that finding, the trial court noted that the Existing Policies had been in place for several years without any documented incidents of problems. The trial court also rejected the Boards' argument that imposing restraints would compel them to violate federal and state record laws. In that regard, the trial court reasoned that the record laws concerned access to information in student records and the Existing Policies did not prohibit parental access to those records; rather, the Existing Policies did not impose an affirmative obligation to disclose information concerning students' gender identification.

The Boards now appeal from the preliminary injunctions issued on August 18, 2023.

 A-0037-23

## II.

In these appeals, Middletown and Manalapan make five arguments. Marlboro joins in three of those arguments. The Center for American Liberty has filed an amicus curae brief in support of the Boards' positions and raises new arguments concerning parental rights.

First, the Boards assert that the trial court incorrectly applied the "well-settled legal right" factor of Crowe. The Boards contend that the "well-settled legal right" must concern a substantive application of law, rather than a procedural aspect of the litigation, such as the Attorney General's right to enforce the LAD.

Second, the Boards argue that the trial court erred in failing to consider the impact of the federal and state student record laws. The Boards claim that parents have an unequivocal right to access the information contained in mandated student records and, therefore, have a right to be notified when students change their gender identity because gender identification is a mandatory part of students' records.

Third, Middletown and Manalapan contend that the injunctions compel them to violate parents' fundamental rights under the Fourteenth Amendment. In that regard, they contend that the injunctions "deprive[] parents, and more

A-0037-23

specifically parents of LGBTQ+ students, of information critical to the parents' ability to actively guide and foster their children's moral and psycho-social development . . . and compels [them] to be the State actor depriving parents of those rights." Amicus Center for American Liberty joins that argument and adds that "[b]ecause social transitioning constitutes psychological treatment, parents have the right to consent when the State is performing that treatment on their children."

Fourth, the Boards argue that the trial court erred by relying on several studies the Attorney General submitted to support his disparate impact claim. The Boards contend that the trial court improperly considered the studies and that any probative value the studies have is "substantially outweighed by the risk of . . . [u]ndue prejudice." See N.J.R.E. 403(a).

Fifth, and finally, Middletown and Manalapan claim that the trial court abused its discretion by enjoining them from amending, modifying, or superseding any portion of their Existing Policies pending the administrative proceedings before the CR Division. They contend that there was no legal or factual basis to afford that additional injunctive relief.

In response the Attorney General argues that, applying the Crowe factors, he demonstrated a sufficient likelihood of success on his claim that the Amended

Policies violated the LAD. The Attorney General contends that "the legal right underlying" the action was "well-settled," as the LAD prohibits unlawful discrimination in schools and expressly grants the Attorney General the right to seek injunctive relief to prevent such discrimination. In addition, the Attorney General maintains that the injunctions, which "simply restore[] the status quo," do not compel the Boards to violate any state and federal student record laws, nor parents' rights under the Fourteenth Amendment.

The American Civil Liberties Union of New Jersey and Garden State Equality, as amici curae, have filed a brief in support of the Attorney General's positions. Those amici contend that the Fourteenth Amendment does not require the Boards to affirmatively notify parents concerning their child's gender identity and that the Amended Policies raise serious equal protection concerns by singling out gender-nonconforming students for disparate treatment.

III.

We begin by pointing out what these appeals concern and what they do not concern. The Boards are appealing from preliminary injunctions entered to maintain the status quo while administrative proceedings are conducted before the CR Division. In issuing the preliminary injunctions, the trial court did not make any final determinations on the merits of any parties' claims or defenses.

15

Accordingly, the narrow issue before us is whether the trial court abused its discretion in granting preliminary injunctive relief.

This appeal does not involve a determination concerning parental rights. The Attorney General sought the injunctions against the Boards. No parents are parties to the litigations in the Chancery Division or in the administrative proceedings before the CR Division.

IV.

Preliminary injunctive relief is appropriate when the moving party establishes: "(1) a likelihood of success on the merits; (2) irreparable harm; (3) a showing that on balance the harm to the moving party is greater than the harm to the party to be restrained; and (4) the public interest will not be harmed." In re Newark, 469 N.J. Super 366, 387 (App. Div. 2021) (first citing Crowe, 90 N.J. at 132-134; and then citing Brown v. City of Paterson, 424 N.J. Super. 176, 183 (App. Div. 2012)). See also Garden State Equal., 216 N.J. at 320-21 (explaining the factors that must be found to support preliminary injunctive relief).[1]

Courts may take a less rigid view of the Crowe factors when injunctive relief is "merely designed to preserve the status quo." Waste Mgmt. of N.J., Inc.

---

[1] Courts sometimes describe the Crowe factors slightly differently, but the key factors that must be satisfied to grant injunctive relief are well-established.

v. Morris Cnty. Mun. Utils. Auth., 433 N.J. Super. 445, 453 (App. Div. 2013) (quoting Waste Mgmt. of N.J., Inc. v. Union Cnty. Utils. Auth., 399 N.J. Super. 508, 520 (App. Div. 2008)) (internal quotation marks omitted).  In that regard, "we have recognized the important role the public interest plays when implicated" and "have held 'that courts, in the exercise of their equitable powers, may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'"  Waste Mgmt., 433 N.J. Super. at 454 (quoting Waste Mgmt., 399 N.J. Super. at 520-21) (internal quotation marks omitted). See also Brown, 424 N.J. Super. at 183 (recognizing the importance of the public interest in balancing the factors).

"An appellate court applies an abuse of discretion standard in reviewing a trial court's decision to grant or deny a preliminary injunction."  Rinaldo v. RLR Inv., 387 N.J. Super. 387, 395 (App. Div. 2006).  "An abuse of discretion occurs when the court's decision is made without rational explanation, inexplicably departs from established policies, or rests upon an impermissible basis."  In re T.I.C.-C., 470 N.J. Super. 596, 606 (App. Div. 2022) (citing Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

1.    The Likelihood of Success on the Merits.

The LAD was enacted to eradicate "the cancer of discrimination," Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 600 (1993) (quoting Fuchilla v. Layman, 109 N.J. 319, 334 (1988)) (internal quotation marks omitted), and it allows for "a full range of legal and equitable remedies" to prevent unlawful discrimination in a place of public accommodation, L.W. ex rel. L.G. v. Toms River Reg'l Schs. Bd. of Educ., 381 N.J. Super. 465, 489 (App. Div. 2005). "A 'place of public accommodation' includes 'any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey.'" Id. at 485 (quoting N.J.S.A. 10:5-5(l)).

The LAD makes it unlawful for schools to subject individuals to discrimination based on their "gender identity or expression," N.J.S.A. 10:5-12(f)(1), which the statute defines as "having or being perceived as having a gender related identity or expression whether or not stereotypically associated with a person's assigned sex at birth," N.J.S.A. 10:5-5(rr). See also C.V. ex rel. C.V. v. Waterford Twp. Bd. of Educ., 255 N.J. 289, 311 (2023) (recognizing that

a student may state a claim under the LAD for discriminatory conduct based on their gender identity or expression).

Claims of unlawful discrimination in violation of the LAD may be based on two separate theories of harm: (1) disparate treatment; and (2) disparate impact. Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 81-82 (1978). "Disparate treatment is demonstrated when a member of 'a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion' . . . ." Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 74 (App. Div. 2004) (quoting EEOC v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990)). "Disparate impact" occurs where the treatment of different groups "fall[s] more harshly on one group than another." Peper, 77 N.J. at 81.

The trial court found that where "only students who identify as transgender are singled out for mandatory parental notification, the [Attorney General] has demonstrated a reasonable probability of success on the merits of its claim that the Amended Policies effect differential treatment of members of a protected class in violation of the LAD." In support of that finding, the American Civil Liberties Union of New Jersey and Garden State Equality point out that the "parental notification mandate . . . is triggered only when nonconforming

students express their gender identities at school and not when cisgender students put their masculinity or femininity on display."

Additionally, the trial court found that the Attorney General demonstrated a reasonable probability of success on his claim that the Amended Policies "'will unlawfully subject these students to a disparate impact in violation of the LAD,' that is, 'a far greater incidence of parental disclosure of their gender identity or expression, and, with it, a far greater risk of harm from this involuntary disclosure.'" The trial court, therefore, concluded that the Attorney General had a "well-settled right, if not obligation, to proceed in a summary manner to enforce a remedial statute protecting members of a statutorily protected class in New Jersey from discrimination."

We discern no abuse of discretion concerning those preliminary findings. The LAD expressly bars discrimination based on "gender identity or expression." N.J.S.A. 10:5-12(f)(1). That prohibition applies to disparate treatment and disparate impact. Peper, 77 N.J. at 81-82; see also N.J.S.A. 10:5-12(f)(1) (prohibiting any place of public accommodation from engaging in discrimination, whether "directly or indirectly").

The Boards argue that the substantive issues concerning the Amended Policies are not well-settled because there is "no caselaw, decision, opinion, or

other determination that parental notification violates [the] LAD."  The lack of direct precedent, however, does not make the trial court's determination an abuse of discretion.  The New Jersey Supreme Court has recognized that the "eradication of discrimination is a public interest," Rodriguez v. Raymours Furniture Co., 225 N.J. 343, 356 (2016), and that "[d]iscrimination based on gender is 'peculiarly repugnant,'" Lehmann, 132 N.J. at 600 (quoting Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 96 (1990)).  Consequently, there is well-established law supporting the trial court's finding of a likelihood of success on the merits.

Moreover, the Attorney General has a well-settled right to seek injunctive relief while an administrative action is proceeding.  The Legislature expressly empowered the Attorney General to proceed "in a summary manner in the Superior Court of New Jersey to obtain an injunction prohibiting" any person or entity that "has engaged in, is engaging in, or is about to engage in any practice declared to be unlawful" by the LAD.  N.J.S.A. 10:5-14.1.  In short, that express statutory authority, combined with the LAD's express prohibition barring discrimination based on "gender identity or expression," supports the trial court's finding of a likelihood of success on the merits.

2.    Irreparable Harm.

21

The risks of harm the trial court identified included "mental health issues, suicide, illicit drug dependency, and infliction of physical or emotional harm by immediate family members." In making that finding, the trial court pointed to "Issues Impacting LGBTQ Youth" by the Trevor Project and "The Report of the 2015 U.S. Transgender Survey" by the National Center for Transgender Equality. The Boards argue that the trial court erred in considering these studies, which they contend are "irrelevant, unduly prejudicial, and lack any probative value."

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). See also Boynes v. Limetree Bay Ventures LLC, 110 F.4th 604, 610 (3d Cir. 2024) ("[C]ourts typically grant preliminary injunctions based on relaxed procedures and incomplete evidence."). Accordingly, New Jersey courts have adopted a flexible approach when evaluating probative information presented at a preliminary proceeding. See Planned Parenthood of Cent. N.J. v. Farmer, 165 N.J. 609, 640 n.10 (2000) (taking judicial notice of a report in assessing the grounds for a preliminary injunction).

22

We discern no abuse of discretion in the trial court's determination concerning irreparable harm. In reaching that conclusion, we note that the trial court had two bases for its determination: the studies in the record and prior legislative findings. Regarding the studies, the trial court acknowledged the Boards' argument but ultimately decided that they were appropriate to consider when making its ruling on the request for injunctive relief. That decision is entitled to substantial deference. See Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010) (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999) (concluding that "[t]he trial court is granted broad discretion in determining both the relevance of the evidence to be presented and whether its probative value is substantially outweighed by its prejudicial nature")). Further, the trial court determined that the LAD's enactment reflects a legislative finding that "because of discrimination, people suffer personal hardships, and . . . [those] personal hardships include: . . . irreparable harm resulting from . . . family and social disruption; and adjustment problems." N.J.S.A. 10:5-3. As such, the trial court properly found that there was a substantial risk of irreparable harm supporting injunctive relief.

3. The Balance of the Harms and the Public Interest.

The trial court also found that the balance of the harms and the public interest both supported injunctive relief. The Boards do not challenge those findings. Instead, they argue that maintaining the Existing Policies would harm parents by violating their rights to access student records and rights under the Fourteenth Amendment. Those arguments, for the reasons discussed below, are unpersuasive. Further, as noted by the trial court, the "[Existing] Policies, until June 2023, had been in place uneventfully" for more than four years. The Boards did not provide any evidence that they were harmed by the Existing Policies during that time.

Relying on several studies and legislative findings, the trial court found that the Amended Policies would harm students by discriminating against them based on their gender identity and expression. Additionally, as previously stated, the New Jersey Supreme Court has recognized that the "eradication of discrimination is a public interest." Rodriguez, 225 N.J. at 356. Given the harm faced by the students and strong public interest in preventing discrimination, we discern no abuse of discretion in the trial court's determination that the balance of harms supported granting injunctive relief.

V.

24

In opposing the injunctions on the Amended Policies, the Boards make two arguments concerning parental rights. First, they contend that requiring them to follow their Existing Policies will compel them to violate parents' rights to access student records. Second, they argue that the injunctions will compel them to violate parents' fundamental rights protected under the Fourteenth Amendment. The record and law do not support either of those arguments.

1.    Parents' Right to Access Student Records.

The federal Family Educational Rights and Privacy Act ("FERPA") and the New Jersey Pupil Records Act ("NJPRA") govern how schools manage and respond to parents' requests for access to student education records. See 20 U.S.C. § 1232g; N.J.S.A. 18A:36-19. FERPA requires that no educational institution shall have "a policy of denying, or which effectively prevents, the parents of students . . . the right to inspect and review the education records of their children." 20 U.S.C. § 1232g(a)(1)(A). Similarly, NJPRA states:

> The State Board of Education shall provide by regulation for the creation, maintenance and retention of pupil records and for the security thereof and access thereto, to provide general protection for the right of the pupil to be supplied with necessary information about herself or himself, the right of the parent or guardian and the adult pupil to be supplied with full information about the pupil, except as may be inconsistent with reasonable protection of the persons involved, the right of both pupil and parent or guardian to reasonable

privacy as against other persons and the opportunity for the public schools to have the data necessary to provide a thorough and efficient educational system for all pupils.

[N.J.S.A. 18A:36-19.]

The Boards assert that, under FERPA and NJPRA, parents have an "unequivocal right" to access mandated information contained in their child's student records. A student's gender is a mandatory item in a student's records pursuant to NJPRA. N.J.A.C. 6A:32-7.3(b)(1). So, the Boards argue parents have the right to be notified when students change the gender identified in their records.

FERPA and NJPRA require parents to have access to information contained in student records. Those statutes do not impose affirmative requirements of parental notification concerning a student's gender identity or expression. See 20 U.S.C. § 1232g; N.J.S.A. 18A:36-19. Additionally, the Attorney General has explained that a student's expression of their preferred gender identity does not automatically trigger a change to their student records. For example, a student's request to be called by a certain name does not require a change to the student's records. Similarly, other "public social transition accommodation[s]" covered by the Amended Policies do not require any change to a student's official records.

More to the point, the Existing Policies do not prohibit parents from accessing their child's student records. Consequently, if a student requested a change to his or her records concerning their gender identity or expression, a parent would have the right to access those records. The Existing Policies simply direct school staff not to affirmatively notify the parents.

Moreover, the Existing Policies do not require or call for school staff to provide false information to parents. Indeed, the Attorney General clarified before the trial court that "schools would be obligated to respond truthfully to a parent or guardian who contacted the school to request confirmation that their child had made . . . a request [for transgender accommodation] or statement [of transgender identification or expression]."

In short, the injunctions do not deny parents the right to access their child's student records. Therefore, the injunctions do not compel the Boards to violate parents' record rights.

The Boards also claim that the trial court's written decision was "devoid of any consideration of New Jersey and [f]ederal [s]tudent [r]ecords law." That contention is not accurate. In the trial court's written opinion, the court expressly addressed the student record laws. In that regard, the trial court's opinion stated:

> The federal and state law cited by defendants pertain to
> access to information in written student records, not to

affirmative requirements of parental notification of a student's transgender orientation or expression. Defendants do not explain how enjoining schools from notifying parents of a child's transgender identification or expression would prevent parents from "inspect[ing] and review[ing] the education records of their children." 20 U.S.C. § 1232g(a)(1)(A). And, while the [NJPRA] requires school boards to formulate regulations with respect to student records to protect the rights of parent or guardian "to be supplied with full information about the pupil," it also provides the qualifier that such information be provided "except as may be inconsistent with the reasonable protection of the person involved." Having demonstrated a reasonable probability of success on the merits of its claim that the Amended Policies will have a disparate impact on members of a protected class under the LAD, the [Attorney General] will likely show that the Boards' Amended Policies of parental notification fit within that exception.

2.    Parents' Fundamental Rights Under the Fourteenth Amendment.

The Fourteenth Amendment grants parents the right "to make decisions concerning the care, custody, and control of their children." Troxel v. Granville, 530 U.S. 57, 66 (2000). See also Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (citing Meyer v. Nebraska, 262 U.S. 390 (1923)) ("the Due Process Clause includes the right[] . . . to direct the education and upbringing of one's children"); Prince v. Massachusetts, 321 U.S. 158, 166 (1944) ("the custody, care and nurture of the child reside first in the parents"). Accordingly, the New Jersey Supreme Court has recognized that right. See Moriarty v. Bradt, 177 N.J. 84,

28

115 (2003) (identifying "the fundamental right of parents to raise their children as they see fit"); Fawzy v. Fawzy, 199 N.J. 456, 476 (2009) (acknowledging "the fundamental right of parents to make decisions regarding custody, parenting time, health, education, and other child-welfare issues"). Notwithstanding that right, this court has recognized that in certain circumstances "the parental right to control the upbringing of a child must give way to a school's ability to control curriculum and the school environment." Dempsey v. Alston, 405 N.J. Super. 499, 512 (App. Div. 2009) (quoting C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 182 (3d Cir. 2005)) (internal quotation marks omitted).

The Boards assert that the injunctions compel them to violate parents' fundamental rights by "depriv[ing] parents, and more specifically parents of LGBTQ+ students, of information critical to the parents' ability to actively guide and foster their children's moral and psycho-social development." In response to this argument, the trial court reasoned that:

> Parental oversight is a bedrock to a stable, nurturing home, and thus to a stable nurturing community. However, it is also settled that the right of parental oversight is not immutable; that it should and must yield where the State can demonstrate a compelling governmental interest. At this preliminary juncture, the [Attorney General] has done so: to ensure that a protected class under a state law against discrimination does not suffer either disparate treatment or disparate impact because of policies requiring parental

notification where a student requesting a transgender accommodation or expressing transgender identification specifically requests that their parents or guardian not be notified.

A review of the record confirms that the injunctions do not infringe on parents' fundamental rights under the Fourteenth Amendment. Although parents have the right to control their child's upbringing, Dempsey, 405 N.J. Super. at 512, caselaw from the United States Supreme Court, the Third Circuit, and New Jersey has not extended this right to require schools to affirmatively provide parents with information. See generally Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health, 503 F.3d 256, 262 (3d Cir. 2007) (finding no "constitutional obligation on state actors to contact parents of a minor").

Additionally, as the Attorney General correctly points out, neither the injunctions nor the Existing Policies prevent students from voluntarily sharing information about their gender identity or expression with their parents. As the Third Circuit held in J.S. ex rel. Snyder v. Blue Mountain School District, "[a] conflict with the parents' liberty interest will not be lightly found, and, indeed, only occurs when there is some 'manipulative, coercive, or restraining conduct by the State.'" 650 F.3d 915, 933-34 (3d Cir. 2011) (quoting Anspach, 503 F.3d at 266). The Third Circuit further explained that "parents' liberty interest will only be implicated if the state's action 'deprived them of their right to make

30

decisions concerning their child,' and not when the action merely 'complicated the making and implementation of those decisions.'" Id. at 934 (quoting C.N., 430 F.3d at 184).

Applying this logic, the preliminary injunctions do not implicate or interfere with parents' rights under the Fourteenth Amendment. The Existing Policies do not impose the kind of "constraint or compulsion" that the United States Supreme Court and the New Jersey Supreme Court have found violative of parental rights. See Anspach, 503 F.3d at 264. Instead, the Existing Policies direct school staff to refer to students by their preferred gender identity without requiring the school to obtain parental consent or to affirmatively notify parents.

We also reject the Center for American Liberty's argument that the injunctions infringe on parents' rights to make medical decisions for their child "[b]ecause social transitioning constitutes psychological treatment." Initially, we note that the Boards did not raise this argument before the trial court. Accordingly, we need not consider this new argument. See Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n, 91 N.J. 38, 48-49 (1982) (explaining that "as a general rule an amicus curiae must accept the case before the court as presented by the parties and cannot raise issues not raised by the parties"). The

31

Existing Policies do not involve medical treatment. Instead, they address situations where students express their preferred gender identification.

Moreover, there is nothing in the record to support the claim that "social transitioning constitutes psychological treatment." Indeed, this type of unsupported assertion appears to be designed to inject divisive contentions, which ironically, only contribute to transgender students' anxieties.

Because the injunctions do not intrude on parents' constitutionally protected rights, they should be upheld so long as they are "rationally related to the achievement of a legitimate state interest." State v. Pimentel, 461 N.J. Super. 468, 491 (App. Div. 2019) (quoting State v. Lagares, 127 N.J. 20, 34 (1992)) (internal quotation marks omitted). Here, the Attorney General has a legitimate interest in preventing discrimination based on gender identity or expression. N.J.S.A. 10:5-12(f)(1). The Attorney General's action, in enjoining the Boards from affirmatively disclosing a students' transgender status to their parents, is rationally related to that goal.

## VI.

The trial court's injunctive relief had two components. First, the trial court enjoined the Boards from implementing their Amended Policies. We have analyzed that portion of the injunctions and discern no abuse of discretion.

32

Second, the trial court enjoined the Boards from amending, modifying, or superseding any portion of the Existing Policies until the proceedings before the CR Division is resolved. The Boards argue that the trial court abused its discretion in issuing the second portion of the injunctions. We agree.

The Boards have the authority to "[m]ake, amend, and repeal rules . . . for its own government and the transaction of its business and for the government and management of the public schools and public school property of the district and for the employment, regulation of conduct and discharge of its employees." N.J.S.A. 18A:11-1(c). In essence, the trial court's injunctions assumed that any amendment to the Existing Policies would violate the LAD. There is no basis for that assumption. The Boards must act consistently with the LAD's mandates. See L.W. ex rel. L.G., 381 N.J. Super. at 485. If the Boards amend their Existing Policies in a way that violates the LAD, the Attorney General can seek appropriate relief, including an injunction to address specific actions.

In short, because there is no basis to enjoin the Boards from making amendments to the Existing Policies, we vacate that portion of the injunctions.

VII.

Preliminary injunctions are designed to be temporary because they grant relief pending a final determination on the relevant issues. Camenisch, 451 U.S.

33

at 395 ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). Here, the trial court granted the preliminary injunctions in August 2023 pending a determination in the administrative proceedings before the CR Division. Those injunctions were entered more than eighteen months ago.

At oral argument, we inquired as to the status of the administrative proceedings before the CR Division. The parties, including the Attorney General, informed us that no substantive proceedings have been conducted nor have any substantive decisions been made by the CR Division. Our affirmance of the preliminary injunctions does not preclude the Boards from moving before the trial court to lift or modify the injunctions if the CR Division proceedings are not prosecuted and resolved in a timely manner.

Affirmed in part and reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0037-23